PHILADELPHIA NAT. BANK *v.* DOWD.

*(Circuit Court, E. D. North Carolina. February 16, 1889.)*

1. BANKS AND BANKING—COLLECTIONS—INSOLVENCY—RIGHT TO FOLLOW TRUST FUNDS.

Plaintiff sent to defendant's bank paper indorsed "For collection and immediate return" to plaintiff, and the paper was collected, and the proceeds mingled with other moneys of the bank, instead of forwarded to plaintiff. The bill contained an uncontroverted allegation that defendant's bank, at all times subsequent to the collection and at the time of defendant's appointment as receiver, had on hand cash to a greater amount than that due plaintiff. The bill asked to have the balance due plaintiff paid in full on the ground that the bank by receiving the paper for collection and immediate return became a trustee, and that either its entire property or the money in its vaults became impressed with the trust. *Held* that, if the mingling of the funds was a breach of trust, it was a conversion; and plaintiff became a simple contract creditor, with no preference at law.

2. SAME.
  It was immaterial whether or not the bank stood in a fiduciary capacity to plaintiff, as the facts stated in the bill showed that the money collected could not be traced into any specific investment or fund, but had been indistinguishably mingled with the general assets.

In Equity. Bill to obtain a priority in the nature of an equitable lien on the assets of an insolvent national bank.

*Battle & Mordecai*, for plaintiff.

*F. N. Busbee*, for defendant.

SEYMOUR, J. The defendant is the receiver of an insolvent national bank. The plaintiff, a bank doing business in Pennsylvania, sent during the winter and spring of the present year to the bank of which defendant is receiver commercial paper indorsed, "For collection and immediate return to the Philadelphia National Bank." This paper was collected by defendant's bank, and the proceeds were mingled with the other moneys of the bank, instead of being forwarded to the plaintiff. The bill contains an allegation, which is not controverted, that the defendant's bank, at all times subsequent to making such collections, and at the time its affairs were placed in the hands of a receiver, had on hand cash to a greater amount than that due to plaintiff. Plaintiff asks to have the balance due it paid in full out of the assets of the insolvent bank on the ground that the latter, by receiving the paper for collection and immediate return, became a trustee for the transaction of the affair, and that either its entire property or the money in its vaults became impressed with the trust. In other words, it claims a priority in the nature of an equitable lien on either the assets of the bank or its cash on hand. The court holds that when defendant's bank mingled the money collected with its general funds, it was, if a breach of trust was committed thereby, a conversion of such money, and that thereupon the plaintiff became a simple contract creditor, with no claim that has a preference at law over any other simple contract debt. If the money was not held by the bank as trustee, the result is the same. On the former supposition, however, plaintiff would have a right to follow the money into any new form into which it could be specially traced. But it is immaterial whether or not the bank stood in the relation of a fiduciary to the plaintiff, because, on the facts stated in the bill, it appears that the money collected cannot be traced into any specific investment or fund, but has been indistinguishably mingled with the general assets of defendant's bank.

Such an opinion would have been very generally expressed without hesitation prior to 1879, when the English court of appeals rendered its decision in *Re Hallett*, (*Knatchbull* v. *Hallett*,) L. R. 13 Ch. Div. 696. I do not consider it at all in conflict with the opinion of Sir GEORGE JESSEL in that case. But it is in conflict with several cases since decided in this country, most of which refer to *Knatchbull* v. *Hallett*. I look upon these cases as introducing a new principle into an old and well-known doctrine of equity, which, with the greatest deference to the courts de-

ciding them, I·do not feel at liberty to follow in advance of any adjudication by the supreme court. The cases are *People* v. *Bank*, 96 N. Y. 32; *McLeod* v. *Evans*, 66 Wis. 401, 28 N. W. Rep. 173, 214; *Harrison* v. *Smith*, 83 Mo. 210; *Peak* v. *Ellicott*, 30 Kan. 156, 1 Pac. Rep. 199; and *Bank* v. *Weems*, 6 S. W. Rep. 802. The facts of the case first cited (*People* v. *Bank*) are, briefly, as follows: Two notes made by the firm of Sartwell, Hough & Ford had been discounted by defendant, a state bank, and, wishing to anticipate payment, they drew checks for the amount of the notes, which were thereupon charged to their account, and the notes were entered upon the books of the bank as paid. In fact they had been sold. Thereafter, the bank having become insolvent, a receiver was appointed, who refused to pay the notes. The case constituted in the court of appeals was an appeal from an order directing the receiver to make such payment. It appeared that at the time a smaller amount of cash than the face of the notes was found in the bank. The court, DANFORTH, J., delivering the opinion, (which is a brief one, and does not put the matter upon any well-defined principle,) held that the receiver must pay the notes in full out of money received by him after the bank's failure; that is to say, out of its general assets. He cites *In re Le Blanc*, 14 Hun, 8, affirmed 75 N. Y. 598, and *Libby* v. *Hopkins*, 104 U. S. 303, and says: "Those cases stand upon the ground of a specific appropriation of a particular fund for the payment of the claim there brought in question. So does the one at bar." If the facts of *People* v. *Bank* showed the existence of a particular fund, there could be no question of the soundness of the decision, but it would not be authority for the cases professing to follow it. The difficulty seems to me to be that, while there once had been such a fund, it had been misappropriated, and neither existed nor could be followed when the bank's assets came to the receiver. *People* v. *Bank* is followed in New York by two decisions of general term,—*People* ·v. *Bank*, 39 Hun, 187, and *McColl* v. *Fraser*, 40 Hun, 111. In the former, BARKER, J., says: "If the identical moneys collected by the bank did not pass into the hands of the receiver, it makes no difference, for in some shape or form they went to swell the assets which fell into his hands." In ·*Re Le Blanc*, 14 Hun, 8, affirmed by the court of appeals without an opinion, and cited as authority by Judge DANFORTH, a particular fund passed into the hands of the receiver, which had been held by the corporation expressly for the payment of petitioner's claim, so the point in controversy did not arise. The New York case is followed by the supreme court of Wisconsin in *McLeod* v. *Evans*, two of the five judges dissenting. As the court puts its decision on an intelligible principle I will cite the reasoning of the prevailing opinion. COLE, C. J., says:

"The conclusion is irresistible from the facts that the proceeds of the trust property found its way into Hodges' hands, and were used by him either to pay off his debts or to increase his assets. * * * It is not to be supposed the trust fund was dissipated and lost altogether, and did not fall into the mass of the assignor's property; and the rule in equity is well established that, so long as the trust property can be traced and followed into other property into which it has been converted, that remains subject to the trust. * * *

*We do not understand that it is necessary to trace the trust fund into some specific property in order to enforce the trust. If it can be traced into the estate of the defaulting agent or trustee this is sufficient.*"

The sentences which I have italicized contain a modification of the equitable doctrine of following trust property necessarily, as I suppose, underlying the decision of *People* v. *Bank*, 96 N. Y. and adopted by the supreme courts of Missouri and Kansas in the cases cited from the reports of those states. *Bank* v. *Weems*, 6 S. W. Rep. 802, is placed upon the same doctrine of equity, but without as wide a departure from the form in which it is usually enunciated. In deciding it GAINES, J., says:

"It may be that when the entire mass is paid away the right to claim a trust in any money or property is lost. But if, as in the present case, throughout all the trustee's dealings with the funds so mingled together he keeps on hand a sufficient sum to cover the amount of the trust money, we think it capable of demonstration that the trust should attach to the balance that is found to remain in his hands. * * * It is shown by evidence that after the bank received the money, amounting to about $5,000, its cash assets were never reduced below $6,000, until they went into the receiver's hands. Even admitting that in the course of its transactions this identical money was paid out by the bank to its uttermost farthing, yet we know that every dollar so expended left its representative and exact equivalent in the vault from which it was taken, and that, when again the money so left was expended, it left in turn its equivalent behind. We see, therefore, that, whatever changes may have taken place in the funds from the receipts and expenditures of the bank, the balance left at the date of its failure was the result of the proceeds of the notes, to the extent to which such balance was thereby increased, and that the cash which went into the hands of the receiver should be deemed the representative of those proceeds, and impressed with the trust character."

Before proceeding to examine the English authorities supposed to support this line of decisions, I will give the doctrine of following trust funds wrongfully converted upon which they are all based, as laid down by Justice Story and Prof. Pomeroy:

"Wherever the property of a party has been wrongfully misapplied, or a trust fund has been wrongfully converted into another species of property, if its identity can be traced it will be held in its new form, liable to the rights of the original owner or *cestui que trust*. The general proposition which is maintained both at law and in equity upon this subject is that, if any property in its original state and form is covered by a trust in favor of the principal, no change of that state and form can divest it of such trust or give the agent or trustee converting it, or those who represent him in right, (not being *bona fide* purchasers,) any more valid claim in respect to it than they had before such change. * * * The right ceases only when the means of ascertainment fail, which, of course, is the case when the subject-matter is turned into money, and mixed and confounded in the general mass of property of the same description." 2 Story, Eq. Jur. §§ 1258, 1259.

"If a trustee or other fiduciary person wrongfully disposes of his principal's securities * * * equity impresses a constructive trust upon the new form or species of property * * * as long as it can be followed and identified. * * * No change in the form of the trust property, effected by the trustee, will impede the rights of the beneficial owner to reach it, and to compel its transfer, provided it can be identified as a distinct fund, and is not so mingled up with other moneys or property that it can no longer be specially separated." 2 Pom. Eq. Jur. §§ 1051, 1058.

The difference between the rule as stated by Story and Pomeroy, and as given in the Wisconsin decision, will be perceived to lie in the fact that according to the former the trust fund must be traced into some specific property, and, if this cannot be done, the right ceases; while according to the latter it exists if it can be traced into the estate of the defaulting agent or trustee, or has been used in paying his debts. Evidently this practically gives a priority to the beneficiary over all creditors not having specific liens. The Wisconsin and Texas cases differ, in that the former gives to a *cestui que trust* whose funds have been wrongfully converted by an insolvent bank an equitable lien on the entire assets of the bank, while the latter gives such a lien only upon the cash coming to the receiver, and only, at least to the whole extent of the trust money, in case such money was never reduced below the amount of the trust fund. In both cases the reason given is that the trust money has gone to swell the amount of the property upon which the lien is given. In neither is it held necessary to follow a distinct fund.

Before passing to the English cases, I will quote the—as it seems to me—conclusive answer given to the reasoning of Chief Justice COLE by CASSODAY, J., in his dissenting opinion in *McLeod* v. *Evans*, for I think it applies to the entire line of decisions. After stating that the proposition that the wrongful conversion of a draft, of itself, gave the plaintiff a preference over all other creditors, regardless of what became of the draft or its proceeds, is supported by no adjudicated case, the judge goes on to say:

"It is probable, as claimed, that the draft, or the proceeds of it, were used by Hodges [the insolvent *quasi* trustee] prior to the assignment in payment of some of his debts. * * * It would merely diminish the amount of his indebtedness to the extent of such payment. That would, in a general way, benefit the estate to the extent that it increased the per cent. that the other creditors would in consequence receive. But, as this estate is badly insolvent, the aggregate amount of such increase would necessarily be very much less than the amount of the draft."

The English cases cited in *Bank* v. *Weems* in support of the position taken by the Texas supreme court are *Taylor* v. *Plumer*, 3 Maule & S. 574, *Pennell* v. *Deffell*, 4 De Gex. M. & G. 372, and *Knatchbull* v. *Hallett*, L. R. 13 Ch. Div. 696; and the United States supreme court case is *Bank* v. *Insurance Co.*, 104 U. S. 54. I will examine these decisions, and attempt to discover what modification of the doctrine of following trust funds laid down by Story and Pomeroy, if any, is introduced in them, and whether they support the theory of either the Wisconsin or of the Texas case.

*Taylor* v. *Plumer* is one of the celebrated cases of the law, noted for a very able opinion delivered in it by Lord ELLENBOROUGH. Briefly stated, its facts are these: A broker having in his possession bank-notes belonging to defendant, which he held for a specific purpose, in breach of his trust purchased with them American bank stock and gold coin, and attempted to escape to the United States. He was pursued by defendant's agents, and stock and money taken from him. Held, in trover, in

an action by the broker's assignee, that defendant was entitled, as against the general creditors, to the money as well as the stock, because the gold coin was the product of defendant's bank-bills. The chief justice, in commenting upon *Whitecomb* v. *Jacob*, 1 Salk. 161, said that the difficulty of tracing money was "a difficulty of fact and not of law, and the *dictum* that money has no ear-mark must be predicated only of an undivided and indistinguishable mass of current money."

*Pennell* v. *Deffell* was a case in which a trust fund was traced into bank-accounts. One Green, an official assignee in bankrupcy, kept accounts with two banks, in his own name, and had deposited in each, not only parts of the trust funds, but also his private money, and had drawn from each for his individual uses.

*Knatchbull* v. *Hallett* is similar to *Pennell* v. *Deffell.* A solicitor having bonds belonging to his client, sold them, and paid the proceeds to his general balance at his banker's. Afterwards he drew checks for his own purposes against, and paid other money of his own into, the account. At his death there was a larger amount to his credit in bank than the proceeds of his client's bonds. It was held in this, as in the preceding case, that the beneficiary had a right to follow the money, and was entitled to a charge on the balance in bank. In the way of this conclusion stood two artificial rules, either of which, taken literally, would have been fatal to the beneficiary's pursuit of the bank balances. The first was the rule in *Clayton's Case*, 1 Mer. 572; the second was supposed to be supported by a *dictum* of ELLENBOROUGH in *Taylor* v. *Plumer*, viz.: "The *dictum* that money has no ear-mark must be predicated only of an undivided and indistinguishable mass of current money." The rule adopted in *Clayton's Case* was that in a bank-account the first drawings out should be attributed to the first payments in. The court held as an exception to this rule, that when a person holding money in a fiduciary character mixes it with his own, and draws out of the mixed fund, it will be presumed that he is first drawing out of his own money. It is evident that the rule was adopted because it gives effect to the probable intention of one having a bank-account, and that the exception likewise gives effect to the probable intention of the trustee. It is not likely that a trustee would use trust funds while he has money of his own idle in bank; and it would be contrary to well-established legal principle to unnecessarily assume a purpose to do a wrong. It was not necessary for the court to go further; but it may also be true that, even had the trustee such an intent, he had not carried it into effect. To convert the trust fund, not only an intent, but some unmistakable act in pursuance of the intent, would be necessary, and the mere withdrawal of a part of the deposit, leaving enough to satisfy the *cestui que trust*, would not be such an act. As soon as, by the application of this exception, it was made to appear that the beneficiary's money remained in the bank-account, the only other difficulty—the fact that it was mingled with other funds, and indistinguishable from them—was easily removed by giving to the client a charge on the balance in bank. Of course no equitable lien could have been enforced in a case at law, and I understand the *dictum* in *Taylor*

v. *Plumer*, which was an action of trover, to apply only to such a case.

In the supreme court case — *Bank* v. *Insurance Co.*, 104 U. S. 54—it appeared that one Dillon, an agent of an insurance company, deposited collections belonging to his principal with plaintiff, in his own name, as "agent," and afterwards paid other money of his own into the account, and checked against it for his private uses. The plaintiff endeavored to enforce a banker's lien upon it for Dillon's individual indebtedness to it. It was held that the descriptive word "agent" was of itself notice of the character of the deposit; and, further, that upon the facts the bank had express notice. Dillon was not, as far as appears, a party to the attempt made to appropriate the company's funds to his private debts. In speaking of the fact that the latter had to some extent mingled his own funds with those of the insurance company, MATTHEWS, J., adopting the reasoning of Sir GEORGE JESSEL in *Knatchbull* v. *Hallett*, says:

"As regards property disposed of by persons in a fiduciary position, * * * whether the disposition of it be rightful or wrongful, the beneficial owner is entitled to the proceeds, whatever be their form, provided only he can identify them. If they cannot be identified by reason of the trust money being mingled with that of the trustee, then the *cestui que trust* is entitled to a charge upon the new investment to the extent of the trust money traceable into it. * * * There is no difference between investments in the purchase of lands or chattels, or bonds, or loans, or money deposited in a bank, * * * for equity will follow the money even if put into a bag, or an indistinguishable mass, by taking out the same quantity."

We are now prepared to see in what if any respect the rule announced above, and called by Sir GEORGE JESSEL " the modern doctrine of equity," with regard to property disposed of by persons in a fiduciary capacity, differs from that laid down in the days of Story and Ellenborough. The rule, as stated by Story or Pomeroy in the extracts taken (*supra*) from their treatises, is extended by adding a case not specially put by either of them, of the mingling of the trust money with that of the trustee in the investment made by the latter. Stating the doctrine in the words of Story, with an addition, which I have put in italics, drawn from the late decisions, it is as follows:

(1) "Whenever the property of a party has been wrongfully misapplied, or a trust fund has been wrongfully converted into another species of property, if its identity can be traced it will be held in its new form liable to the rights of the original owner or *cestui que trust*. The right ceases only when the subject-matter is turned into money, and mixed and confounded in a general mass of property of the same description."

(2) *If the property cannot be identified by reason of the trust money being mingled with that of the trustee, then the cestui que trust is entitled to a charge on the new investment to the extent of the trust money traceable into it. This will be done, even if the money is mingled with that of the trustee in a bank-account, or in a bag, or other mass of money.*

As far as the addition to the rule consists in giving a charge to the *cestui que trust* on a new investment made in part with his own money and in part with that of the trustee, it has no novelty. In *Docker* v. *Somes*, 2 Mylne & K. 664, Lord BROUGHAM decided that if a trustee mixes trust

funds with his private moneys, or employs both in a trade or adventure of his own, the *cestui que trust* may, if he prefers it, insist upon having a porportionate share of the profits, instead of interest on the amount of the trust fund so employed; and in *Harford* v. *Lloyd*, 20 Beav. 310, where a sum of money belonging to a trust fund was, as it seemed, used with other money in the purchase of *post obit* securities, the court enforced a lien on such securities for the amount of the trust money so used. Both of these cases are noticed by Story, Eq. Jur. §§ 465, 1261*a*. The only thing, then, which can be considered recent in proposition 2, *supra*, is the application of the doctrine to a bank-account, and the illustration made use of, of the bag of money, or the indistinguishable mass thereof. Nor do I understand the master of the rolls to announce this as a new principle of equity, but rather as the application of an established rule to a new case. In the often-quoted case from 1 Salk. the judge, after speaking of the rights of one who employs a factor and intrusts him with the disposal of merchandise, states that there is an equity to follow the proceeds, attaching to the case of a factor as well as to that of a trustee: "But," he adds, "if the factor have money, it shall be looked upon as the factor's estate, * * * for in regard that money has no ear-mark, equity cannot follow that in behalf of him that employed the factor." Speaking of this remark, Sir George Jessel says: "There is no distinction between a person occupying one fiduciary position or another fiduciary position as to the right of the beneficial owner to follow the trust fund." I had not understood the court to have attempted any such distinction in that case. I further suppose the judge who decided *Whitecomb* v. *Jacob* to have been speaking, not of money in a bag, or of any particular mass or heap of money, which might conceivably have been in possession of the factor at his death, and into which his employer's money might have been traced, in which case it would have been analogous to money mingled by a trustee with his own, in a bank-account; but rather of the ordinary case of money on hand at his death, bearing no marks of being the proceeds of the factor's trust money, any more than of any other transaction in which he might have been engaged. Of such money it might well have been said in current proverbial phraseology that it had "no ear-marks." Such a case does not come within the decision or the reasoning in *Knatchbull* v. *Hallett*. See *Ex parte Hardcastle*, (decided after, and referring to, *Knatchbull* v. *Hallett*,) 44 Law T. (N. S.) 523. I do, however, conceive it to come within both decision and argument in *Bank* v. *Weems*. Taking that case to be law, I should add another to the two propositions laid down as the law of tracing, viz.:

(3) And in case trust money received by a trustee is not shown to have been either paid to the *cestui que trust*, preserved *in specie*, or invested, the *cestui que trust* shall, upon the death or insolvency of the trustee, have a lien on all moneys coming to the hands of his representative or receiver, on the ground that such trust money went to swell the decedent's or insolvent's cash assets.

The above proposition being granted, I can see no reason why the additional one necessary to sustain the Wisconsin, Missouri, Kansas, and

(as I conceive) the New York cases does not follow. I give it in the words of COLE, C. J., in his opinion in *McLeod* v. *Evans:*

(4) Nor is it "necessary to trace the trust fund into some specific property. If it can be traced into the estate of the defaulting agent or trustee this is sufficient."

It is evident that 3 conflicts with Justice Story's statement that the right to trace ceases when the subject-matter is turned into money, and mixed and confounded with the general mass of the trustee's money, (which I have endeavored to distinguish from any particular fund or account of the trustee, into which it may be traced, according to rule 2.) Proposition 4 contradicts all previous statements of the doctrine, including not only that given in *Knatchbull* v. *Hallett*, but also that in *Bank* v. *Weems*. The judge who wrote the learned and able opinion of the supreme court of Texas in *Bank* v. *Weems* dissents in express terms from the last proposition, and declines to follow the list of American authorities cited by me in the first part of this opinion. Nor do I assert that he maintains proposition 3; but I do contend that that doctrine necessarily follows from the position taken by him. The decision in the Texas case relates only to the cash assets of an insolvent bank, and only to a case in which those assets never from the time of the deposit of the trust fund up to the suspension of the bank fell below the amount of that deposit. But neither of these facts seems to me to materially distinguish it from the proposition which I have stated to be necessarily involved in it. As JESSEL, M. R., says: "There is no distinction between a person occupying one fiduciary position or another," as to the right to follow trust funds, and it is quite unimportant that the trustee is a bank. Nor can it make any difference whether the money coming to a receiver's hands is the general cash of a corporation kept in its vault, or that of an individual kept by him in his pocket, his safe, or his chest, or in all or any of these receptacles, as convenience may have dictated. If, indeed, the corporation had kept a deposit with some other person or corporation, and the trust fund could be traced into it, then the rule in *Knatchbull* v. *Hallett* would apply. But I am speaking of a case like the Texas one or the one at bar, where there is no special fund, but where the trust money goes into the general cash of the trustee. The only remaining ground of difference lies in the fact that the cash on hand never fell below the equivalent of the trust fund. But I conceive that, if there happened to be enough on hand at the time of the suspension to pay the amount due to the beneficiary, it can make no possible difference whether that amount was at all times kept on hand, or whether the trustee, after spending a part of the trust money, replaced it with money drawn from other sources. If, in the imaginary case of one thousand sovereigns of trust money put in a bag, the trustee had taken out a sovereign, and afterwards put one in, there would be no doubt but that the whole amount then being in the bag would be the property of the *cestui que trust;* and so, had the amount taken out and replaced been one, or five hundred, sovereigns. Certainly, in the circumstances supposed, the reason why the sum finally left in the bag is the property of the *cestui que trust,* is because the trus-

tee, in replacing the sovereigns, intended to restore to the bag coins to fill the place of the ones taken from it. But, if it is permissible to suppose that the bank officers in paying out the money of their beneficiary intended that the money of their depositors should take its place, I see no difficulty or difference in supposing this to be the case when such money comes in after the amount on hand sinks below the total of the trust fund. And if, instead of being a question of actual intention, the intent is assumed, on the ground that it was the duty of the bank to keep the trust fund on hand, and that the corporation cannot allege that it did not perform this duty, then it may be said that it was just as much the duty of the bank to replace any part of the fund withdrawn from its vaults as it had originally been to keep it there, and the court can as well assume one intent as the other. As I have already said, I do not consider the doctrine (2) formulated from the opinion of JESSEL, M. R., as any departure from that always held. He calls the money deposited in bank or put in a bag "a new investment," upon which he allows the beneficiary a charge, and goes upon the idea that there is thus something specific into which he traces the fund. But the proposition (3) resulting from the Texas case seems to entirely depart from the idea of a new investment of the trust money, or following it into anything specific. The money in the vaults of a bank, carrying on its ordinary business, cannot properly be said to be the result of any one or more of the deposits put in it. If at the time of the insolvency of a bank a thousand dollars are found in its safe, and half a dozen deposits of that amount are shown by its books to have been paid in, it is unreasonable to attribute the fund—as is done in *Bank* v. *Weems*—to a particular one of them which happens to have been trust money. If, indeed, the suspension of business by the bank should immediately follow the placing the trust money in its vaults, the case would come within the rule as given by JESSEL, M. R., for the money would as a fact be a part of the mass of money in the bank, and equity would give a charge upon it for the amount of the trust fund. It is upon this ground that I understand the court to have disapproved in *Knatchbull* v. *Hallett* of the ruling of FRY, J., in *Ex parte Dale*, L. R. 11 Ch. Div. 772. Dale & Co., on December 5th, sent paper for collection to a branch of the West of England Bank. The bank made the collection, and deposited its amount in its vaults, in which it was mingled with other moneys. On the 7th it sent a letter to D. & Co., incorrectly stating that the money had been remitted. The 8th was Sunday, and the bank did not open on the 9th, but instead went into liquidation. It is probable, that the collection was made on the 7th, when the letter was sent to 'D. & Co., and may be assumed as true that the very money collected went into the hands of the liquidators.

The Texas case is put entirely upon the proposition that the trust fund is traced into specific property that came to the receiver. I wish to examine a little more in detail than I have yet done whether this is true. It would have been impossible, even with access to the books of the bank, to have followed the money which came into its vaults by reason

of the collections in litigation; but it is possible to put supposititious cases which would cover every probable use of the money. There is one which is clearly inadmissible, viz., that the precise money collected remained in the vault. If that had been the case it would have been found separated from the other funds, and marked as plaintiff's money. If the bills collected were mingled with the general mass in use for current business, the probability that they remained in the safe for a number of weeks is so infinitesimal that it may be entirely dismissed from consideration. We can suppose that the $5,000 collected by the Texas bank consisted of five packages of $1,000 each. One of them may be supposed to have been used in purchasing a safe, or some other article of furniture. At the same instant we may suppose that a depositor paid into his account $1,000. On the theory of the Texas case, that $1,000 took the place of the $1,000 paid out. Why? On the idea of an intent on the part of the bank officers to replace the money paid out? Clearly there was no such intent. Will equity assume, in contradiction of the evident fact, that the bank intended to pay A. with B.'s money? Is the idea of tracing the money the one adopted? But the *cestui que trust*'s money was invested in the purchase of a safe, and on the doctrine as laid down in all the books his right was to consider himself either the owner of the safe, or, if he preferred, the holder of a lien upon it, or a simple contract creditor of the trustee to the amount of the money misapplied. There is no authority to be found for the statement that he had, in addition, the right to take a different $1,000 in the possession of the trustee, but not appropriated by the latter to the trust, on the ground that it ought to have been so appropriated. Another $1,000 package we may suppose used to pay a check drawn by a depositor. To that extent it diminished the indebtedness of the bank, and increased the dividend to be paid to the other depositors. The plaintiff, on the doctrine of following trust funds, would be entitled to be subrogated to what would have been such depositor's dividend. Let us suppose now, what did not happen in *Bank* v. *Weems*, but did in *People* v. *Bank*, and also in the case at bar, that the officers of the bank made away with the greater part of the cash on hand, leaving just enough to enable business to be carried on until they could reach a place of safety. It may be supposed that they carried away the remaining $3,000. It would not, in that case, have been true that "every dollar expended left in turn its equivalent behind," or that the trust money went to swell the general assets of the bank. This last, perhaps more completely than any other, supposition shows the artificial character of the assumption that the bank officers may be supposed, as long as they left enough to satisfy the trust fund, to have intended to use only the money which the bank had a right to use. I think, then, that it must be evident that at the times of the failures the trust fund was not either in the Texas bank, or in the one whose case is at bar, unless considered in the banks by reason of some artificial rule. The exception to the rule in *Clayton's Case*, made in *Pennell* v. *Deffell* and *Knatchbull* v. *Hallett*, was not, as I have shown, artificial, but in consonance with the facts of these cases. To apply it or any rule analogous to it to the case

at bar would be to make use of a legal fiction. The officers of the bank had no intent to make any difference between the money collected for their correspondents and that passed over the counters of the bank by depositors. It would be equally objectionable, because equally a false assumption, to say that the money, having been traced into the bank-safe, and not accounted for, must be presumed to remain there until the contrary can be proved; and that, the contrary not having been proved, the court will presume the money in the safe to contain that of the beneficiary. The contrary is proved to a moral certainty by all the facts of the case. To say that it does not lie in the trustee's mouth to assert that it had been wrongfully paid out would be to invoke a doctrine of estoppel not applicable to a receiver who represents creditors, as well as the delinquent trustee, and who must therefore be allowed to show the very truth of the matter.

I have treated this case as one in which the plaintiff is entitled to be considered as a *cestui que trust*. I think that it is not entitled to be so considered, but that it ought to be treated as an ordinary creditor, because the money collected, or at least a large part of it, was allowed to remain for several months with the defendant's bank. As I understand the course of business among banks, in regard to collections of this kind, it is not expected that the same moneys that are collected shall be forwarded. On the contrary, they are uniformly treated as is the money of ordinary depositors, and are remitted by means of the system of exchanges of credit which forms a part of the general mercantile business of the country. The result of giving such collections a preference over the ordinary debts of a bank will be to make national banks preferred creditors in every case of insolvency of other national banks. The statute (Rev. St. § 5242) forbidding preferences in the distribution of the assets of insolvent national banks is not believed to prevent a beneficiary from following any trust money held for him by a bank into any new investment thereof made by the bank. If, however, the doctrine could be carried to the extent claimed in the Wisconsin or even in the Texas case, it would seem to be an unlawful preference under the act of congress.

Since writing the foregoing, my attention has been called to a case not accessible when the case at bar was argued. In *Cavin* v *Gleason*, 105 N. Y. 256, 11 N. E. Rep. 504, one in whose hands money had been placed to be invested used the entire amount excepting $30 in paying his personal debts, and made an assignment. Held, that the creditor was not entitled to a preference, except as to the $30, which, as it appeared, came into the hands of the assignee. ANDREWS, J., delivering the opinion of the court, says:

"It is clear, we think, that upon an accounting in bankruptcy or insolvency a trust creditor is not entitled to a preference over general creditors of the insolvent merely on the ground of the nature of his claim. * * * We know of no authority for such a contention. * * * If it appears that trust property has been wrongfully converted by the trustee, and constitutes, although in a changed form, a part of the assets, it would seem to be equitable that the things into which the trust property has been changed should, if required, be

set apart for the trust, or, if separation is impossible, that priority of lien should be adjudged in favor of the trust-estate for the value of the trust property or funds, or proceeds of the trust property, entering into and constituting a part of the assets.    This rule simply asserts the right of the true owner to his own property.    But it is the general rule  *  *  *  that, in order to follow trust funds;  *  *  *  they must be identified.  *  *  *  The courts below seem to have proceeded upon a supposed equity springing from the circumstance that, by the application of the fund to the payment of White's creditors, the assigned estate was relieved *pro tanto* from debts which otherwise would have been charged upon it, and that thereby the remaining creditors  *  *  *  will be benefited.  We think this is quite too vague an equity for judicial cognizance."

Bill dismissed without prejudice.