RICHARDSON v. NEW ORLEANS COFFEE CO., Limited.

(Circuit Court of Appeals, Fifth Circuit. May 31, 1900.)

No. 931.

1. BANKS—DRAFTS DEPOSITED FOR COLLECTION—EFFECT OF BANK'S INSOLVENCY.
Checks and drafts delivered by a depositor to a bank for collection and deposit at a time when the bank was insolvent, and known to be so by its officers, and which had not been collected when the bank closed its doors, remain the property of the depositor, although they were indorsed to the bank without qualification, and on their subsequent collection by the receiver the proceeds may be recovered from him by the depositor.

2. SAME—RECEIVING DEPOSIT WHEN INSOLVENT—OWNERSHIP OF MONEY DEPOSITED.
Money deposited in a bank on the day it closed its doors, and when it was known by its officers to be insolvent, remains the property of the depositor, and may be recovered by him from the receiver, where it is shown that it went to increase the sum which came into his hands.

3. SAME—RIGHT OF DEPOSITOR TO RECLAIM.
On the day a bank closed its doors, and when it was known by its officers to be insolvent, complainant, a customer, made a deposit of money, and also of certain checks and drafts for collection and credit, all of which were credited, at the time, to its account. During the day, it also purchased drafts from the bank, for which it gave checks about equal in amount to its entire deposit, but such drafts were returned unpaid, and were tendered back to the receiver. *Held,* that the purchase and sale of the drafts was a separate transaction, which, as it did not create any liability affecting the general creditors of the bank, and was in itself fraudulent on the part of the bank, did not affect complainant's right in equity to reclaim the deposits from the receiver.

Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

The bill in this cause was filed in the circuit court of the United States for the Eastern district of Louisiana by the New Orleans Coffee Company, Limited, a Louisiana corporation, against Frank L. Richardson, as receiver of the American National Bank, a banking corporation organized under the laws of the United States. It is shown by the bill that Richardson had been appointed receiver of the bank by the comptroller of the currency of the United States. On the 5th of August, 1896, the bank was doing business in the city of New Orleans, and on that day the New Orleans Coffee Company, Limited, in the usual course of business, deposited in the bank drafts on banks outside of the city of New Orleans aggregating $610.06, checks on banks in the city aggregating $146.82, and $172 in currency, and a check on the American National Bank for $25.78. Each check and draft was indorsed, "Pay to the order of the American National Bank." The evidence in the case shows that the checks and drafts were deposited for collection. The deposits were all entered in the pass book of the complainant, the New Orleans Coffee Company, Limited,—the out-of-town checks in one item, and the cash and the checks on the New Orleans banks in another. On the morning of August 5, 1896, the complainant had a balance in the bank to its credit of $1,136.79; adding the deposits made that day, it had a total to its credit of $2,091.45. On the same day the complainant bought of the bank two New York drafts, one for $2,000 and the other for $50, and gave to the bank its check for

102 F.—50

$2,050. The complainant also drew checks on that day for $10, $47.05, and $185. These drafts and checks were not paid. The bank closed its doors shortly after 3 o'clock that afternoon. The directors of the bank decided next morning not to reopen for business. The bank, at the time it received these deposits, was insolvent, and had been so for some days previous, and its condition was known to its officers. The cashier, at that time, was in New York trying to negotiate a loan to tide the bank over its difficulties. On the evening of August 5, 1896, at about 8 o'clock, the note and collection clerk of the bank received instructions to keep the drafts and checks received that day separate from the funds of the bank. The city checks so deposited were collected next morning. The out of town drafts and checks were afterwards collected by the bank examiner, who took charge of the bank before the receiver was appointed. After the receiver was appointed, the proceeds of all the checks and drafts and the cash in the bank were delivered to him. The currency so deposited was at once mingled with the funds of the bank at the bank teller's desk, and it served to increase the sum that went into the hands of the receiver. When the bank opened on the morning of August 5, 1896, it had on hand, as general deposits, $15,897.54. The entire amount of cash deposited on that day—the last day the bank was open—was $6,934.76, and the amount of cash on hand when the bank closed its doors, and which was afterwards delivered to the receiver, was $9,222. This money is reserved, and is in the hands of the receiver. The check on the American National Bank for $25.78 was charged to the account of J. W. Platt, and credited to the account of the complainant, and that transaction neither increased nor diminished the funds of the bank. After the return of the New York drafts for $2,050 unpaid and dishonored, the complainant tendered them to the receiver, and demanded the return of his entire deposit of August 5th as a preferred creditor. The receiver refused to return the money, and the bill in this case was filed. The foregoing facts were alleged in the bill. It was also averred that the complainant was ignorant of the condition of the bank, and that the bank, in receiving the deposits when it was insolvent, perpetrated a fraud upon the complainant. The purpose of the bill is to rescind the purchase of the New York drafts, and to obtain a decree for the entire amount of the currency, checks, and drafts deposited by the complainant on August 5, 1896. The court below denied the claim for $25.78, the amount of the check on the American National Bank, but entered a decree for the complainant in the sum of $928.88, being the balance of the deposits made on August 5th, including the checks and the currency, and rescinded the transactions with reference to the New York drafts. From this decree, the receiver appealed to this court, and the decree, with the proper specifications, is assigned as error.

W. C. Cochran (F. L. Richardson, on the brief), for appellant.
Joseph P. Blair (Denégré, Blair & Denégré, on the brief), for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge, after stating the case as above, delivered the opinion of the court.

All the money in dispute in this case except $172 was collected on checks and drafts which the appellee deposited with the American National Bank. The checks and drafts were entered on the appellee's pass book, each having been indorsed, "Pay to the order of the American National Bank." There is evidence in the case showing that the checks and drafts were deposited with the bank for collection. The bank was then about to close. Its insolvent condition was known to its officers. At about 8 o'clock in the evening of August 5, 1896, the day the deposits were made, the bank officers instructed the note and collection clerk to keep the drafts and checks received that day

separate from the funds of the bank. After receiving these checks and drafts, the bank closed its doors at about 3 o'clock on the same day, and was not again opened for business. The checks on the New Orleans banks were collected the next day, and later the drafts on the banks outside of the city were collected by the bank examiner, and the money was all placed in the hands of the receiver. The appellee claims that it has the right to recover this money because the absolute title to the checks and drafts did not, on the facts, pass to the bank; that, until they were collected, the relation between the bank and the depositor was that of principal and agent. The appellee also claims the right to recover the money because it was a fraud, on the part of the bank, to receive the drafts and checks as deposits in view of the hopeless insolvency of the bank, which was known to its officers. There is no trouble about tracing these funds. They were all collected after the bank closed its doors, and collected after the officers of the bank had given instructions that the checks and drafts received on August 5th should be kept separate from the general funds of the bank. The evidence shows that these funds went into the hands of the receiver, and are now held by him. We are therefore confronted with the plain question: Is the New Orleans Coffee Company, Limited, the depositor, equitably entitled to these funds, or is the receiver of the bank entitled to them? The receiver can, of course, only claim them for the benefit of the general creditors. His contention, then, is this: that although these checks and drafts were received after the bank was insolvent, and collected after its doors were closed, and the funds kept separate, he should now be permitted to take these funds, and mingle them with the other assets of the bank, and distribute them with the other assets among the general creditors. The argument is that this customer, the appellee, who dealt with the bank on the last day of its business existence, should fare no better than those who dealt with it previously. This view, however, cannot prevail, because the court must look at the special transaction between this appellee and the bank. If that transaction was such that the bank was only the agent of the depositor to make the collections, the funds, of course, never became the property of the bank, and they can therefore be reclaimed by the appellee. This comes from the fact that a fiduciary relation exists between the agent and the principal, making the former in equity a trustee, and the agent, of course, is not permitted to convert the funds of the principal. The principal is always permitted to recover his funds if they can be traced. It is equally true that a fraud on the part of the bank in procuring funds or in receiving checks and drafts for collection would have the effect of making the bank hold the checks or drafts or other proceeds in equity as trustee for the depositor. And, as in this case, when the funds can be traced, the depositor or owner of the drafts can recover. In Richardson v. Denegre, 35 C. C. A. 452, 93 Fed. 572, this court held that "checks delivered to a bank by a depositor for collection and deposit at a time when the bank was insolvent, as must have been known by its officers, and which had not been collected when the bank closed its doors, remain the property of the depositor, and may be recovered by him from the receiver." It is true that the checks in the case just

cited were indorsed "For deposit," and that in the instant case the indorsement was without qualification. The drafts and checks, however, were credited on the pass book of the appellee, and the evidence shows that they were delivered to the bank for collection. There was no intention by the transaction to create the relation of debtor and creditor before the bank made the collections. If there had been such intention, the fraud on the part of the bank would have defeated the intention, and preserved the fund for the depositor so long as it could be traced. The form of the indorsement, however, cannot be a matter of consequence or change the principles involved in a case where the litigation is between the original parties, no innocent holder of the paper having intervened. In Bank v. Armstrong, 148 U. S. 50, 13 Sup. Ct. 533, 37 L. Ed. 363, a bank holding paper for collection passed into the hands of a receiver. The court held that the relation between the bank and the depositor as to uncollected paper was that of principal and agent, and that the money collected on the paper after the bank had closed, which had not been commingled with the general funds of the bank, could be reclaimed. The principle announced in that case sustains the decree of the circuit court in this case, for the reason that the bank was the agent of the depositor, and that a trust obligation was created by such agency. Morse states the rule that should govern in such cases:

"After a bank has suspended, it ought not to receive payments upon business paper previously deposited with it for collection, or, at least, not in such a manner that the money so received by it will pass into its general assets, and the owner of the paper will be placed in the position of one of its creditors, entitled only to take his dividend. * * * Proceeds received after the bank becomes insolvent are held in trust, and may be recovered in full." 1 Morse, Banks (3d Ed.) § 248a.

This view is sustained by many authorities, the facts varying in each case, but the principle being the same. Levi v. Bank, 5 Dill. 104, Fed. Cas. No. 8,289; In re Havens, 8 Ben. 309, Fed. Cas. No. 6,230; Richardson v. Banking Co., 36 C. C. A. 307, 94 Fed. 442; Same v. Bank, 36 C. C. A. 315, 94 Fed. 450.

The other point made by the appellee is equally as conclusive. The fraud of the bank would prevent its obtaining title to the checks and drafts and their proceeds. In Railway Co. v. Johnston, 133 U. S. 566, 10 Sup. Ct. 390, 33 L. Ed. 683, the court held:

"When a bank has become hopelessly insolvent, and its president knows that it is so, it is a fraud to receive deposits of checks from an innocent depositor, ignorant of its condition, and he can reclaim them or their proceeds."

There can now be no doubt about the fact that it is well settled by authority that a bank should not continue business when it is known to its officers that it is hopelessly insolvent. The relation between a bank and its customers is such that great confidence is asked and reposed. A banker who knows that he is hopelessly insolvent cannot honestly continue business, and receive money from his customers. He may not intend to defraud a particular customer, but he will be held, of course, to have intended the inevitable consequences of his act,—that is, to cheat and defraud all persons whose money he receives and whom he fails to pay before he stops business. A banker

who receives money or drafts for collection under such circumstances gets no title, legal or equitable, and the funds or proceeds can always be claimed and recovered by the owner when they can be traced and identified. On August 5, 1896, the day these drafts were placed in the hands of the bank, the appellee bought of the bank, drawing its check on the bank for the purpose, two New York drafts aggregating $2,050. These drafts were worthless and were returned unpaid. The appellee also drew some small checks, which were also dishonored and unpaid. The appellant now insists that the purchase of these drafts and the drawing of these checks defeat the right of the appellee to recover the money sued for. The appellee offered to surrender the drafts to the receiver when it demanded the proceeds of its drafts and checks. The sale of these worthless drafts to the appellee was also a fraud. We cannot think that the perpetration of the latter fraud, the sale of the worthless drafts, can in any way relieve the bank of its liability for the perpetration of the first fraud, the receipt of the claims for collection. The evidence shows that the appellee had no contract to draw against the deposit of the checks and drafts. The appellee was solvent, and the bank had allowed it to overdraw. If the bank had been solvent and continued business, and had failed to collect the checks and drafts deposited with it, the appellee would have been required to pay for the New York drafts if they had been honored. The evidence shows that the purchase of the drafts was a transaction independent and separate from the deposit of the checks and drafts for collection. On the morning of August 5th, before the appellee made any deposits, it had to its credit in the bank $1,136.79. This much more than covered the small checks drawn by the appellee on the bank, and leaves for consideration only the effect on this transaction of the purchase of the New York drafts, one for $2,000 and the other for $50. As these drafts were not paid, and as they did not diminish the funds in the bank or create any liability against it affecting the general creditors, we do not think it had any effect upon the equitable rights of the appellee. The entries on the books of the bank in reference to the purchase of these drafts was a mere matter of bookkeeping, and should not be permitted to affect the substantial rights of the parties.

The appellee was also entitled to recover the $172 deposited in currency by it. The undisputed facts in the case show that this money, or its equivalent in cash, passed into the hands of the receiver. He either received the actual money deposited, or it served to increase the amount delivered to him. In the case of Richardson v. Redemption Co. (C. C. A.) 102 Fed. 780, we have recently handed down an opinion which deals with the question of tracing cash deposits. The case is, on its facts, almost identical with the instant case, so far as the deposit of cash is involved. It is sufficient to say that when a bank, on the eve of insolvency, by committing a fraud obtains the money of a customer, and mingles it with the general funds of the bank, the title to the money does not pass; and if the money is not expended, but kept in the bank and turned over to the receiver, the money, or a like amount, although mixed with the general funds of the bank, can be recovered in a suit against the receiver. The circuit

court was right in deciding that the appellee could recover the proceeds of the checks and drafts and the cash deposited. The decree of the circuit court is affirmed.