## RICHARDSON v. NEW ORLEANS DEBENTURE REDEMPTION CO., Limited.

### (Circuit Court of Appeals, Fifth Circuit.   May 29, 1900.)

### No. 930.

1. BANKS—RECEIVING DEPOSIT WHEN INSOLVENT—OWNERSHIP OF MONEY DEPOSITED.

When a bank receives a deposit after hopeless insolvency, the fraud avoids the implied contract between the parties by which the relation of debtor and creditor would ordinarily arise, and prevents the money deposited from becoming the property of the bank, and a trust is the equitable result.

2. SAME—RECOVERY FROM RECEIVER—TRACING MONEY DEPOSITED.

Where a bank receives a deposit on the day of its suspension, when it is known by its officers to be insolvent, and mingles the money with its own funds, which, to an amount larger than the deposit, pass into

the hands of a receiver, it is not essential to the right of the depositor to recover his deposit from the receiver that he should be able to trace the identical money deposited into the receiver's hands, but it is sufficient that the amount which went into his hands was increased by the amount of the deposit.

Appeal from the Circu , Court of the United States for the Eastern District of Louisiana.

W. C. Cochran (F. L. Richardson, on the brief), for appellant.
W. H. Rogers, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. The bill in this case was filed by the New Orleans Debenture Redemption Company, Limited, against F. L. Richardson, as receiver of the American National Bank, to collect $1,658.60, which the company had deposited in the bank. The bill also embraced a claim for $1,152, the proceeds of certain collections made by the bank for the plaintiff, but that part of the claim has been settled since the suit was brought. The company bases its right to recover the money on the alleged fact that the bank had received it as a deposit when it was hopelessly insolvent, and under such circumstances as to make the receipt of it a fraud. The facts averred and proved may be briefly stated: The American National Bank, a banking corporation organized under the laws of the United States, was on August 5, 1896, and prior to that time, engaged in a general banking business in New Orleans. On that day the bank was hopelessly insolvent, and had been so for a long time. Its condition was well known to its officers and managers. The appellee did not have knowledge of its condition. The appellee was a regular customer and depositor of the bank. When the bank opened on the 5th of August, 1896, it had in cash on hand $15,897.54. Just before 3 o'clock on the same day, the appellee deposited in the bank $83.60 in silver and $1,575 in currency, making a total of $1,658.60. The entire cash deposits received by the bank on that day amounted to $6,934.76. It paid out during that day $13,610.24. Just after 3 o'clock the bank closed its doors, and never reopened for business. The whole amount of cash in the bank after its doors were closed was $9,722, $500 of which was paid to the bank's attorney, and $9,222 turned over to the bank examiner, who subsequently turned over the same to the receiver. Before receiving these funds the appellant had been duly appointed receiver of the bank by the comptroller of the currency of the United States. It is agreed that the books of the bank do not show how much of the cash which was turned over to the receiver was received by the note and collection clerk, or how much cash was received and not paid out by the receiving and paying teller, or how much of the cash turned over to the receiver was part of the original funds in the bank on the morning of August 5, 1896. There was a special meeting of the directors of the bank at 8:30 p. m., Wednesday, August 5, 1896, at which meeting the president of the bank stated what had taken place during the day, and that the deposits received during the day had been set aside. The directors at this meeting approved of this action, and instructed the president to hold said de-

posits separate and apart from the banking funds, and to examine carefully into the condition of the bank, and report at the meeting to be held at 8:30 a. m. on the 6th of August. The evidence, however, showed that the deposits in cash received on the 5th of August were not really kept separate. All of the money in the bank which had been received as general deposits, and which had not been paid out, appears to have been handed to the receiver at the same time. Many depositions were offered in evidence in the case, but it is not deemed necessary to state the evidence further. The circuit court (Parlange, District Judge, presiding) granted the relief prayed for in the bill. The decree is to the effect that the appellee have and recover from the receiver the sum of $1,658.60. The decree is given priority over the unsecured creditors of the bank. The receiver has appealed to this court, and the decree is assigned as error.

Ordinarily, when funds are deposited in a bank, the relation of debtor and creditor immediately arises between the banker and the depositor. The money deposited becomes the property of the banker. He has the right to use it, but must pay the debt to the depositor by cashing his checks. When the banker obtains the deposit by committing a fraud, as by receiving it after hopeless insolvency, the relation between the parties is very different. The fraud avoids the implied contract between the parties that would arise in its absence, and, having barred contract, a trust is the equitable result. The fraud itself gives no lien. The fraud prevents the money deposited from becoming the property of the banker, and thereby prevents the relation of debtor and creditor arising between the parties. As the money does not become the property of the banker, it, of course, remains the property of the depositor. In the banker's hands, therefore, it is a trust fund,—as much so as if it had been a special deposit. The money which the banker has received in due course of honorable business before insolvency has become his property, and he the debtor of those who deposited it. Now, if the banker, having money in his bank, fraudulently receives other money, and mingles it with the moneys on hand, can the defrauded depositor reclaim his money? That is the question presented by this case. The bank received $1,658.60 of the appellee's money just before it closed. It was received under circumstances of fraud, so that it remained the property of the appellee. It passed with the other funds to the hands of the receiver; or, if the identical money did not so pass to the receiver, the sum turned over to the receiver was increased exactly $1,658.60 by the appellee's deposit. This is clear, because if, after receiving the appellee's deposit and placing it with the general funds, payments were made out of the mass of money during the business of the day, it is immaterial whether the identical dollars deposited by the appellee were paid out or not. The amount that went into the hands of the receiver was, by the deposit of the appellee, increased to the amount of the deposit made by it. If we find that the transaction between the appellee and the bank created a trust or lien on the funds of the bank with which the appellee's deposit was mingled, the trust or lien extended to the whole mass of money, and the paying out of part of it would not remove the charge from the remainder. The question, then, is reduced to this:

If a banker takes $1,000 not his own, and mixes the sum with $10,000 of his own money, can the owner of the $1,000 reclaim it? Has he, in equity, a charge on the whole to the amount of his money which has gone into it? Formerly, it was held that he had not. The equitable right of following misapplied money, it was said, depended on identifying it, the equity attaching to the very property misapplied. Money, it was said, had no earmarks, and the tracing of the fund would fail. This view was manifestly inequitable and unjust, and so, finally, it was held that confusion by commingling does not destroy the equity, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion of the fund a priority of right over the other creditors of the possessor and wrongdoer. This evolution of the doctrine of tracing trust funds is noticed incidentally by Mr. Justice Bradley in Frelinghuysen v. Nugent, 36 Fed. 229, 239. To create the trust it is not necessary to show that the identical money went into the hands of the receiver. It is sufficient if the funds in his hands are increased by the deposit. In Bank v. Blackmore, 21 C. C. A. 514, 516, 75 Fed. 771, 773, Judge Taft, delivering the opinion of the circuit court of appeals for the Sixth circuit, said:

"It may not be necessary to show earmarks upon the proceeds of the thing parted with, to justify such a remedy, but it must at least appear that the funds in the hands of the receiver were increased or benefited by the proceeds; and the recovery is limited to the extent of this increase or benefit."

In Association v. Austin, 100 Ala. 313, 321, 13 South. 908, 909, McClellan, J., delivering the opinion of the court, said:

"We will concede that, so far as the right of the complainants to fasten a preference lien in the nature of a trust on the assets of the bank depends upon the fraud of the bank and its officials, their cases are made out on the facts we have stated. And if they had further shown that the identical money which was deposited by and collected for them, respectively, had come to the hands of the receiver, and was held by him in specie at the time of bills filed, or that their funds had been mingled with the funds of the bank which came to the receiver's hands, and constituted, in part, the gross sum held by him, or that their identical money had been invested by the bank in tangible property, which came to the hands of the receiver and was held by him, they would have been entitled to the relief they seek."

The observations quoted from the last two cases cited show why, in those cases, the trust was not declared. In Quin v. Earle (C. C.) 95 Fed. 728, 731, Judge Gray presents a very interesting discussion of the question and an accurate statement of the correct rule:

"With regard to personal property other than money, the question of identification is generally easy of determination. Not so of money, and perhaps some personal property other than money. If these be confused in the mass of exactly similar things, specific identification becomes impossible. But the more modern doctrine has come to be that, where the fraudulent depositary so mingles goods which he has obtained by fraud with the mass of like goods of his own, the whole may be seized, or considered as held in trust, until equitable separation of the property of the defrauded party is made. So, advancing one step further, where money thus obtained has gone to swell the aggregate in the possession of the fraudulent party, it may, under proper proceedings, be segregated in amount from such aggregate sum, and made the subject of a trust, in order to accomplish the ends of justice. If my bushel of corn be obtained from me by fraud, and be poured into the mass of similar grain in the bin of the party committing the fraud, justice is sat-

isfied, and no one can be wronged, by my having restored to me a bushel of the same grain out of the bin, though the identical grains obtained from me are not restored. If, on the other hand, the funds in possession of the defrauding bank be not increased by the property or the money so obtained, so that the aggregate amount of assets for distribution among the general creditors is not made larger by reason of the plaintiff's contribution thereto, then this extension of the doctrine of identification will not apply, and the complainant cannot have remedy as for a preferred claim."

Sir George Jessel, master of the rolls, in the case of Knatchbull v. Hallett, 13 Ch. Div. 696, 707, reviewed the English cases on this subject. He shows the struggle of the able judges of the law courts over the earmarking of money, and that finally Lord Ellenborough throws over the doctrine as to money not earmarked not being followed. We cannot take space to cite and quote the many cases commented on by the master of the rolls. The opinion is marked by a keen sense of equity and strong common sense. On the direct point in question here he says:

"I have only to advert to one other point, and that is this: Supposing, instead of being invested in the purchase of land or goods, the moneys were simply mixed with other moneys of the 'trustee,'—using the term again in its full sense, as including every person in a fiduciary relation. Does it make any difference according to the modern doctrine of equity? I say, none. It would be very remarkable if it were to do so. Supposing the trust money was 1,000 sovereigns, and the trustee put them into a bag, and by mistake, or accident, or otherwise, dropped a sovereign of his own into the bag. Could anybody suppose that a judge in equity would find any difficulty in saying that the cestui que trust has a right to take 1,000 sovereigns out of that bag? I do not like to call it a charge of 1,000 sovereigns on the 1,001 sovereigns, but that is the effect of it. I have no doubt of it."

The supreme court, in an opinion concurred in by all the justices, quotes with approval the doctrine enunciated by the master of the rolls. Mr. Justice Matthews, delivering the opinion, makes this indorsement of Knatchbull v. Hallett, supra, on the point here in question:

"But he [Sir George Jessel] dissents from the application of the rule made by Lord Ellenborough, when the latter added, 'which is the case when the subject is turned into money, and confounded in a general mass of the same description'; for equity will follow the money, even if put into a bag or an indistinguishable mass, by taking out the same quantity. And the doctrine that money has no earmark must be taken as subject to the application of this rule." Central Nat. Bank v. Connecticut Mut. Life Ins. Co., 104 U. S. 54, 69, 26 L. Ed. 693, 700.

There should be no question about this doctrine on principle. If one's money is invested in land, the title being taken in another's name, equity creates a resulting trust in the land as against the wrongdoer. If an agent, bailee, or trustee invests another's money in personal property, a trust results. If one's money is lent, and a note or bond taken, the owner of the money can have a lien or trust declared on the note or bond to secure his money so used. Numerous cases show that money can be traced into other assets, notes, bonds, and stocks. There is no good reason for not applying the same doctrine to money, the measure and representative of all property. If one's money is used with other money in buying a bond, equity can fasten a lien on the bond, and sell it to reimburse the one whose money has

been so used. So, we think, if one's money is wrongfully mingled with a mass of money, that equity can direct the possessor and wrongdoer, or his successor, to take out of the mass a sum sufficient to make restitution. The decree of the circuit court is affirmed.