### MORAN v. SIGHTLER.
### No. 6447.

United States Court of Appeals for the District of Columbia.

Decided March 30, 1936.

STEPHENS, Associate Justice, dissenting in part.

J. Bruce Kremer, George B. Springston, and Herbert M. Bingham, all of Washington, D. C., for appellant.

Bernard I. Nordlinger, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

MARTIN, Chief Justice. ·

This case is brought to decide whether a certain fund now in dispute should be administered by John F. Moran, as receiver of the Park Savings Bank, or by S. B.

Sightler, Jr., as trustee in bankruptcy of the estate of Samuel T. McDevitt.

It appears that prior to March 1, 1933, the Park Savings Bank, a corporation, was engaged in a general banking business in the city of Washington, D. C., and that Samuel T. McDevitt was one of its depositing customers. At 2 p. m. on that day, the bank being then insolvent, the board of directors passed a resolution suspending and terminating their business as a bank of deposit and restricting the withdrawal of deposits to 5 per cent. of the amount thereof. At the same time the directors passed a resolution providing that all deposits thereafter received by the bank were to be segregated and kept apart from the assets of the bank and to be treated as trust or bailee funds, and that such funds might thereafter be withdrawn by the depositors without restriction on demand.

In accordance with the foregoing instructions so made, the officers and employees of the bank thereupon segregated and kept apart from the assets of the bank all moneys deposited after 2 p. m. March 1, 1933, as trust or bailee funds, allowing depositors of such funds the unrestricted right to withdraw the same on demand.

On March 1, 1933, after 2 o'clock p. m., Samuel T. McDevitt deposited to his credit in the trust or bailee account the sum of $455. The amount of this deposit by McDevitt was credited in the new special "bailee account," and was entered as a trust account entirely separate and segregated from the former accounts kept by the depositors in the bank.

On July 13, 1933, the appellant, John F. Moran, was appointed and qualified as receiver of the Park Savings Bank by the Comptroller of the Currency.

At the time when the bailee deposit was made by McDevitt, he was indebted to the Park Savings Bank in the sum of $1,376.72, evidenced by a promissory note dated February 17, 1933. The record does not disclose the date of the maturity of this note. On September 13, 1933, McDevitt filed a voluntary petition in bankruptcy, and on September 27, 1933, the appellee, S. B. Sightler, as trustee, thereupon demanded of Moran, receiver, the sum of $455 deposited as aforesaid in the trust or bailee account by McDevitt. This demand was refused by the receiver upon the ground that the amount of the deposit had been credited upon the note which McDevitt at the time of the deposit owed to the bank, and consequently that the fund was not assets of the bankrupt estate of McDevitt, but had become part of the general assets of the bank, to be administered as such by the receiver.

The issue thus raised was whether the funds so deposited by McDevitt in the special or bailee account under the conditions aforesaid became assets of his bankrupt estate to be administered as such, or whether such funds had become intermingled with the general assets of the Park Savings Bank to be administered as such by the receiver of that bank. This issue was submitted to the referee in bankruptcy, who held in favor of the trustee of the bankrupt estate, and an order was made that Moran, as receiver of the bank, should certify to the Comptroller of the Currency for payment in due course of administration the finding that Sightler, as trustee of McDevitt, bankrupt, is entitled to and has a claim in the sum of $455 against the receiver, which claim must be paid in cash, not subject to offset, and not by distribution of dividends.

Upon a petition for review of the referee's order filed by Moran, receiver, the issue was reconsidered by the referee in bankruptcy and his former decision was approved and followed. Thereupon Moran, as receiver, filed a petition in the Supreme Court of the District of Columbia for a review of the order of the referee. The court, upon consideration, held that the amount of the special deposit aforesaid was held in a bailee account in trust for the owner, McDevitt, and that the same could not lawfully be set off against the note liability of McDevitt to the bank, and therefore that the funds held by the receiver as the proceeds of such deposit should be turned over to the trustee in bankruptcy in cash. From this order Moran, as receiver, has appealed to this court.

We think the decision of the lower court is right. On March 1, 1933, when the bank was first declared to be insolvent, the funds now in question had not yet been deposited, for, if they had, no question of set-off such as is involved herein could have arisen. Afterwards, before McDevitt made the deposit, the bank, by resolution passed by its directors, declared its insolvency and restricted the amount of withdrawals by depositors to 5 per cent. of their credit balances. It may be assumed as a matter of course that under these

circumstances McDevitt would not have been willing to deposit his funds with the bank knowing that in such case he would be allowed to withdraw only 5 per cent. thereof for current use and would be forced to await the settlement of a bank receivership to recover any balance which might possibly be returned to him thereafter.

In compliance with its stipulation, the bank actually segregated the funds so deposited from the former assets or business of the bank. The deposit therefore was not made as a deposit in the Park Savings Bank as theretofore existing; but in an agency established by the bank to conduct a new subsidiary business separate and apart from the former business of the bank. The bank therefore did not acquire the ownership of the funds, nor was it invested with any authority over them except for the purpose of keeping them in custody, subject to the order of McDevitt. Accordingly, when Moran became receiver of the bank, he did not acquire a right to seize or appropriate these funds for any purpose without the order or consent of McDevitt. His action therefore in applying the funds to the payment of the promissory note held by the bank was invalid. Under the circumstances, the funds still remained the property of McDevitt and afterwards became assets of his estate in bankruptcy.

The bank is entitled only to the payment pro rata of the indebtedness owing to it by McDevitt from the assets of the bankrupt estate; whereas, if the claim of the receiver be sustained, the Park Savings Bank would secure a preference over the other creditors of McDevitt equal to the amount in question. Such a result would not only be inequitable, but would be a distinct violation of the terms and conditions under which McDevitt intrusted his money to the custody of the bank.

The following authorities by analogy sustain this view: Dakin v. Bayly, 290 U. S. 143, 146, 54 S.Ct. 113, 78 L.Ed. 229, 90 A.L.R. 999; Hanover Nat. Bank v. Suddath, 215 U.S. 110, 30 S.Ct. 58, 54 L.Ed. 115; Western Tie & Timber Co. v. Brown, 196 U.S. 502, 25 S.Ct. 339, 49 L.Ed. 571.

Affirmed.

STEPHENS, Associate Justice (concurring).

I concur in the result, but for reasons somewhat different from those stated in the majority opinion.

I understand the facts to be—and without dispute so far as the record herein is concerned—that: Prior to 2 P. M. on March 1, 1933, Samuel T. McDevitt owed the Park Savings Bank $1376.72 on a promissory note. At 2 P. M. on that date, the bank caused restrictions to be placed on withdrawals and announced that all deposits accepted thereafter would be credited to a special "bailee account" of each depositor. After 2 P. M. on said day, McDevitt deposited $455 and this was credited to him in accordance with the bank's announcement. Later the bank's affairs were placed in the hands of a receiver (John F. Moran), and still later, on September 13, 1933, McDevitt filed a voluntary petition in bankruptcy, and on September 27, 1933, a trustee (S. B. Sightler, Jr.) was appointed and qualified for duty. The trustee made demand upon the receiver for the sum of $455. This demand was refused on the theory that the bank had a right of set-off.

I find nothing in the record warranting the statement in the majority opinion that the bank directors by resolution required the funds deposited after 2 P. M. "to be treated as trust or bailee funds," or the statement that the amount of the deposit of $455 was "entered as a trust account. * * *" If such form of resolution or entry had been used the bank would thereby have made itself by its own declaration the trustee of an express trust, and there would be no further question in the case, because it is a settled rule that a trustee cannot apply trust funds upon its individual debt due from the cestui que trust. It is true that it is asserted in the appellee's brief that there was such a resolution, but this assertion is based merely upon a description in 63 Washington Law Reporter, 222 of the contents of certain pleadings and of the action of the trial court thereon in another case (John F. Moran, Receiver of the Park Savings Bank, v. C. R. Matheny, Equity No. 57,836) in the Supreme Court of the District of Columbia; but I think we cannot have recourse to such informal data for the facts in this case. If I correctly read the record, the facts upon which the trial court herein based its rulings appear only in the referee's certificate on review, and are as above set forth.

Nevertheless, I think the decision must go here as it did below—against the right of set-off asserted by the receiver—and I think it not necessary to determine just what words are most apt to describe the right in which the bank received the deposit, that is, whether as trustee, agent, other fiduciary, or bailee. The case is controlled, I think, by Dakin v. Bayly, 290 U. S. 143, 54 S.Ct. 113, 78 L.Ed. 229, 90 A.L. R. 999, and under that decision the essential question here is not what is the proper legal name of the right in which the bank acted, but whether, in receiving the deposit after 2 P. M. on March 1, 1933, it acted in a different right than it did when theretofore it took the promissory note of McDevitt and thereon advanced him the $1376.72. In Dakin v. Bayly, checks with unrestricted endorsement had been deposited for collection with the Peoples Bank of Clearwater, Florida (hereinafter referred to as the bank of deposit), which forwarded them to the First National Bank of St. Petersburg, Florida (hereinafter called the bank of collection) for collection. The latter collected the items drawn on it by charging the accounts of its own depositors, and collected those drawn on other local banks by the settlement of balances between it and them. It then sent to the bank of deposit drafts to cover the amounts in question, but later dishonored them. Thereafter, in an action on the common counts and on an account stated brought by the receiver of the bank of collection against the bank of deposit, the latter sought to set-off the amount of these drafts. A statute of Florida (Comp.Gen. Laws 1927, § 6834) however, required of the bank of deposit only due diligence in the forwarding of checks for collection, and in the absence of negligence conditioned liability for the amount of the checks on receipt of final payment from the bank of collection. The Supreme Court held that the parties were presumed to have contracted with reference to this statute, and that the situation was as if they had expressly agreed that the bank of deposit was to act as agent only, and was not to become the debtor of the depositors unless and until it had received actual and final payment. Therefore the Supreme Court denied the set-off sought. It said:

"The conclusion is that, while the Clearwater bank individually owed the receiver of the St. Petersburg bank, the latter did not owe the former, but at best the claim was made as an agent. If this be true, set-off may not be allowed, for a defendant sued upon his individual debt may not avail himself for this purpose of a demand against the plaintiff held in a fiduciary capacity. [Authorities cited]." 290 U.S. 143, at page 146, 54 S.Ct. 113, 114, 78 L. Ed. 229, 90 A.L.R. 999.

But the decision is not limited by the use of the phrase "fiduciary capacity," for the Court went on to ask:

"Were the cross-demands of the parties of the same quality, or, to state it otherwise, did each claim from the other in the same right?"

And this question the Court, because of the effect of the Florida statute above referred to, answered in the negative, pointing out that under the statute the bank of deposit must assert its claim—

"as representative or agent of depositors, for a recognition of its right to sue as owner would destroy the cause of action of the depositors against the St. Petersburg bank or leave that bank subject to a possible double liability. If the cross-demand is asserted in an agency capacity, the debts are not held in the same right by the two banks, lack mutuality, and the one cannot be set off against the other." 290 U.S. 143, at page 148, 54 S.Ct. 113, 115, 78 L. Ed. 229, 90 A.L.R. 999.

I think it clear in the instant case that the bank held its claim against McDevitt on the promissory note for $1376.72 in a different right or capacity than that in which it received his deposit of $455. What name is to be applied to the two differing rights or capacities is not material. The words "bailee account" are, of course, not apt, at least on this record, because there is nothing to show an actual segregation of the item deposited, in such manner as would put mere possession in the bank, with title left in McDevitt. But certainly the bank used the term "bailee account" for some purpose, and I think obviously that purpose was to differentiate the right or capacity in which it took McDevitt's deposit after its suspension of payment at 2 P. M. on March 1, 1933, from the right or capacity in which it did business prior to said moment, whether by accepting deposits or by making loans on promissory notes. Had the bank, after clear knowledge of insolvency and without McDevitt's knowledge thereof, accepted McDevitt's deposit in the same right or capacity as that in which it was doing business before

its insolvency, it would have made itself the trustee and McDevitt the cestui que trust and his deposit the subject of a constructive trust. Marvin v. Martin (C.C. A.) 20 F.(2d) 746; Richardson v. New Orleans Debenture Redemption Co. (C.C. A.) 102 F. 780, 52 L.R.A. 67. The bank, I think, must be taken, because of its suspension of payment, to have had clear knowledge of insolvency. Appellant concedes that the suspension of payment was an act of insolvency. But there is no showing that McDevitt knew of the insolvency. To permit the bank after insolvency, and to protect itself against charge of fraud, to receive McDevitt's deposit in a "bailee account," and then to permit it to set-off against his deposit a claim against him arising before its suspension of payment would be, I think, to permit the bank to blow hot and cold upon its receipt of McDevitt's funds. Had McDevitt, when he took his money to the bank, been informed it was insolvent, it is unthinkable that he would have made the deposit at all. The bank's conduct in crediting his deposit to a "bailee account" should not be construed as putting him in a worse position, without his consent, than the one in which he would have been had he not made the deposit. Appellant urges that allowance of set-off will give McDevitt and his trustee in bankruptcy one hundred cents on the dollar, and that this is all they have a right to. This seems to me to beg the question. If, in crediting McDevitt's funds to a "bailee account," the bank obligated itself to no more than a payment of one hundred cents on the dollar, then the appellant's contention is correct; but if the bank in so crediting the deposit must fairly be said to have obligated itself to treat McDevitt as if he were a depositor in a different bank, then the appellant's contention is incorrect, and this I think is the fairer and more reasonable construction to be placed upon the bank's conduct. And the answer to this question makes, of course, a deal of difference to the bankrupt's creditors. For if the set-off is disallowed, the trustee will reclaim the $455 *in toto* for the bankrupt's creditors, but will respond to the bank on its claim of $1376.72 only according to the bankrupt's pro rata.

The assertion of the appellant that Dakin v. Bayly is distinguishable because there the bank of deposit was an agent whereas here McDevitt was not, I think confuses the position of the parties. In Dakin v. Bayly, the person asserting the set-off was the bank of deposit in its right or capacity as agent of the ultimate owners of the checks. It was held as such agent to be in a different right or capacity than that in which it was obligated individually to the bank of collection. In the instant case the person asserting the set-off is not McDevitt or McDevitt's trustee but the bank, and I think the right or capacity in which it urges that its claim of $1376.72 against McDevitt ought to be used to cancel his $455 claim against it, is a different right or capacity than the one in which it stood when it accepted his deposit.

I think a second point in Dakin v. Bayly also concludes the instant case against the bank. It was there asserted that the bank of deposit accepted the drafts of the bank of collection as payment, thus assumed ownership of them, acknowledged the change in the relationship to its depositors from that of collecting agent to that of debtor, and so properly asserted the set-off. This position the Supreme Court repudiated for the reason that, as it said:

"As respects the set-off of cross-demands, the rights of the parties became fixed at the moment of the insolvency of the St. Petersburg bank [the bank of collection] and consequent suspension of payment [authority cited]; and the right to set off is governed by the state of things existing at the moment of insolvency, not by conditions thereafter arising [authority cited], or by any subsequent action taken by any party to the transaction [authority cited]." 290 U.S. 143, at pages 148, 149, 54 S.Ct. 113, 115, 78 L.Ed. 229, 90 A.L.R. 999. The facts there were that when the bank of collection closed its doors, it had, as sub-agent for the bank of deposit's depositors, made collection and sent the drafts to the bank of deposit; that is to say, it failed while the drafts were in course of collection. The Supreme Court said:

"At the moment of suspension it remained liable as subagent to the depositors of the Clearwater bank, as we have shown. Could it also be subjected to an independent liability to the Clearwater bank? Was it not entitled to treat the agency relation originally existing as still in force, in the absence of notice from the owners of the collection items that the status had been altered? Could any position taken by the Clearwater bank of its own initiative affect without the depositor's consent the pre-

existing relation of principal and subagent between the depositors and the St. Petersburg bank? We think not. [Authority referred to.] Those depositors had an election either to sue the St. Petersburg bank or to bring action against the Clearwater bank for want of due diligence, or to treat the drafts as payment and hold the Clearwater bank as their debtor, but there is no intimation in the record that they made any election prior to the subagent's insolvency, nor indeed that they then knew whether collection had been effected or remittance received by the Clearwater bank. There is no reason to presume that they elected to stand on their cause of action against the Clearwater bank for lack of due diligence in accepting drafts instead of currency, and thus created a right of action in that bank against the St. Petersburg bank by way of subrogation, or to affirm that the agency had terminated and its status become that of a debtor. Nor is any custom pleaded whereby the Clearwater bank was to become the debtor of the depositors of the checks upon receipt of something other than cash or equivalent from the sub-agent." 290 U.S. 143, at pages 149, 150, 54 S.Ct. 113, 116, 78 L.Ed. 229, 90 A.L.R. 999.

So in the instant case I think that at the moment of suspension of payment the rights of the parties, as respects the set-off of the cross-demands, became fixed. At that moment the bank had a claim on its promissory note against McDevitt and if at that moment McDevitt had had funds on deposit in the bank, a right of set-off would have existed against such funds. But the relationship arising between the bank and McDevitt after suspension of payment by the acceptance of his deposit in a "bailee account" was a new and different one, and I think no position taken by the bank of its own initiative and without McDevitt's consent could so alter the relationship existing prior to suspension of payment as to bring the one existing thereafter and by virtue of the "bailee account" deposit into, so to speak, the same legal plane.

I think the result is not changed by title 24, § 411 of the 1929 Code of Law for the District of Columbia, providing:

"Mutual debts and claims under contract between the parties to a common-law action, or between any of the several defendants and the plaintiff, or between one party and the testator or intestate of the other, or between the testators or intestates of both parties, may be set off against each other by plea in bar, *whether said debts or claims be of the same or a different nature or degree, and whether the claims be for liquidated debts* or unliquidated damages for breach of contract; and if either debt be in the form of the penalty of a bond the exact sum to be set off shall be stated in the plea. [Italics supplied.]"

The italicized language in my view refers to claims different in nature in the sense of arising upon different contracts, or different in amount, and not to claims arising in different rights or capacities.