MIKE RONCHETTO ET AL., APPELLANTS, V. STATE BANK OF BEVIER, IN LIQUIDATION, RESPONDENT.—51 S. W. (2d) 174.

Kansas City Court of Appeals.   June 13, 1932.

*Waldo Edwards, George N. Davis* and *Charles W. Shelton* for appellant.

*Edward G. Robison* and *C. G. Buster* for respondent.

BOYER, C.—This action was instituted to establish a priority demand against the assets of the State Bank of Bevier in the hands of the commissioner of finance for liquidation. The recovery is sought on the ground of fraud and that of a trust *ex maleficio* arising from

the circumstances under which plaintiffs made a deposit of $1000 in said bank. It is alleged that plaintiffs made said deposit on February 1, 1930; that the bank was then and had been conducting a general banking business and was open for the purpose of receiving deposits of money and the transaction of other business; that plaintiffs in good faith and believing said bank to be solvent, and that its business and affairs were honestly and faithfully conducted, and that it was financially able to pay all of its liabilities, made the deposit which was received and accepted by the bank; that the bank agreed to repay plaintiffs on demand with interest, but never did so; that the bank at said time and prior thereto was hopelessly insolvent, unable to meet its obligations in the usual course of business, and would be obliged to suspend operations and be unable to repay plaintiffs their money, all of which said facts were known to the officers of the bank at the time; that the bank was closed by its board of directors February 25, 1930, and all of its affairs, business, and assets passed into the hands of the commissioner of finance; that the money of plaintiffs was in the bank at said time and reached the hands of the commissioner.

The sufficiency of the petition is not questioned and it appears to be adequate. The answer was a general denial. The case was heard as in equity and the trial court found that plaintiffs were not entitled to a preferential claim; denied the demand as such and allowed it as a common claim. Plaintiffs duly appealed.

The contest over the issues in the trial and here is centered upon the question of the hopeless insolvency of the bank at the time the deposit was made and upon the question of the character of knowledge or notice required on the part of the officers of the bank of said condition. The evidence will be reviewed with these questions in mind.

It is admitted that the bank received the deposit at the time alleged; that plaintiffs had no knowledge that the bank was insolvent; that it suspended business on February 25, 1930, by order of its board of directors and at that time passed into the hands of the commissioner for liquidation; that at said time the sum of money deposited by plaintiffs and more was in the hands of the bank and reached the hands of the commissioner who is now possessed of more than sufficient assets to pay said claim.

The bank had been examined by representatives of the department of finance and had been under observation by the commissioner for some period of time. An examination of its affairs was made and concluded October 28, 1929, and report thereof made to the commissioner. This report contained a statement of resources and liabilities, a list of the officers and directors of the bank, show-

ing large indebtedness to the bank of all of them except one, and the amount of loans in excess of that permitted to the president, cashier, and a director of the bank; a classification of past-due paper and criticism of loans, overdrafts, and of management. The character of the loans and discounts constituting the main asset of the bank calls for special attention. This report showed a total amount of personal loans and discounts to an amount of $148,049.57. Of these loans the examiner classified $45,855 as "slow or otherwise objectionable," and $68,960.40 as "doubtful on which loss cannot be determined." There was $60,000 in loans past due, and about one-half of them were six months over due. The president owed the bank $8492.38; the cashier owed $7666.74; one of the directors owed $7818.50; and another owed $4250. A son of the president owed the bank $5000. All but one of these parties had no basis for credit. There were overdrafts amounting to $9417.67; the total liability on deposits at this time was $229,426.32; the total assets and liabilities were stated to be $273,279.42. The loans to the officers were criticized and questioned not only as to regularity, but as to a basis for the credit extended. The assistant cashier was also indebted to the bank in the sum of $3000, reported to have been carried for a long time, past due, and highly unsatisfactory at best. There were no minutes of the meetings of the board of directors since January, 1929; request for their production was made, but they were not produced although the directors present claimed they had held monthly meetings. The examiner in his report concluded that when it was considered that over $100,000 of the contents of the note case was under criticism, nothing but a "very, very questionable condition" could be seen.

A copy of the foregoing report was sent to the president of the bank and the commissioner notified the president and one of the directors by letter advising the necessity of a conference for November 12th at his office. The cashier notified the commissioner that the board could not meet on that day and the date was postponed to November 19th, at which time no one appeared at the office of the commissioner except the cashier who then reported that certain members of the board could not come and that he did not think it necessary to bring the other directors. The commissioner demanded a meeting and dispatched the cashier to get the board of directors together for a meeting that evening at Moberly. A meeting was held at that place, at which only a part of the directors appeared with an attorney and another individual who was a stockholder. At this time, from the information given to the commissioner, he concluded and demanded that at least $20,000 of bad loans be withdrawn and cash to that amount substituted in the bank. From the

information furnished him at the time he was of opinion that the bank would then be solvent, but at that time he knew nothing about the amount of accommodation paper in the bank, nor about misapplication of funds, nor of embezzlement, nor about the amount of undisclosed liabilities of the bank which appeared later.

In response to the demand of the commissioner that $20,000 be substituted for an equivalent amount of paper in the bank, said amount was deposited and the paper withdrawn. This was done by one of the directors of the bank in accordance with the terms of a contract between him and the other directors of the bank dated November 21, 1929, by the terms of which the purchasing director obtained notes to the amount of $20,000 and as a further consideration was granted an option for a period of ninety days to take over all of the assets of the bank upon agreeing to pay all of its liabilities except capital, surplus, and undivided profits. In this contract the parties executing it on behalf of the bank represented that the statement of the bank at that time was correct, and warranted that the bank had no liabilities other than those shown in the statement; and they also guaranteed to the purchaser that the assets of the bank would be sufficient to pay all cost of collection and of liabilities and that in event they were insufficient then said parties would pay the deficit. The statement of the bank was not correct and the option to buy its assets was never exercised.

Following the meeting held at Moberly, and on November 23, 1929, the commissioner wrote a letter to the president of the bank reviewing the situation, severely criticizing its management, the condition of its loans, and other matters; and called the attention of the president to the fact that it had been agreed that all doubtful paper should be put in process of collection, reduced and secured, and that this involved more than $68,900; and that there still remained in the note case a total of nearly $50,000 in loans considered very undesirable, and which, it was agreed would be standardized or removed. The letters proceeds: ''Your management has been deplorably bad. I have never seen anything quite equal to it for lack of interest and intelligent direction. I am not speaking personally but officially and from the standpoint of business when I say that Mr. W. A. Rowland cannot run your bank and ever hope to run it successfully.'' (Mr. Rowland was the cashier.) The commissioner referred to the fact that it had been agreed that a different management would be installed and directed to proceed vigorously to correct the condition; that false reports had been made and that the cashier did not deny that he had been continuously misrepresenting the state of affairs to the department, and that it was evident it was done for the purpose of deception; that the bank would have been

summarily closed on the 19th without calling the board together if it had not been for interest in the community and a high regard for some of the individuals of the institution. A demand was made that the loans to the officers of the bank be reduced to a proper limit and information requested as to what was proposed to be done with items in the note case that were considered doubtful and unsatisfactory. Daily reports were demanded, and it was stated that unless progress was shown another conference would be called; that there was no need of running a bank on mere promises and speculation, and repeated the demand that a new management was absolutely necessary. On November 25, 1929, the president made terse reply as follows: "Your requests shall be complied with." There was no compliance with the requests of the commissioner; the cashier of the bank continued the dominating influence in it and continued to falsify reports and conceal the condition of the bank. No new management was ever installed, although the commissioner was led to believe that another person was in charge and control of the note case.

One of the reports received from the bank under date of December 31, 1929, reported loans and discounts to the amount of $138,449.41, and total resources and liabilities of $237,848.99. The daily statement of the bank under date of February 1, 1930, showed bills receivable in the amount of $166,525.03, and total resources of $241,-716.12; liabilities were listed at the same amount in which was included the sum of $21,728.50 to cover capital stock of $10,000 and surplus and profits. On the day the bank closed the statement showed bills receivable in the sum of $165,048.82, with total resources listed in the amount of $240,945.95. The inventory of the bank made by the commissioner showed bills receivable $167,813.70, and total resources $226,251.94, and that $14,331 of bills receivable included in the above amount were held as collateral by another bank, leaving the total bills receivable in the bank at the sum of $153,482.70. Relative to the value of said bills receivable, the oral testimony of the deputy commissioner in charge of the bank and that of another witness of forty years residence in the community, confirmed the previous finding of the bank examiner and tended to show that $100,000 of said bills receivable were doubtful and that approximately $70,000 thereof were worthless. The liquidating agent had been in charge of the bank about fifteen months up to the time of the trial and during that period had been able, by diligent effort, to collect on bills receivable only the amount of $32,995.04, and of this amount $5,477.18 had been collected on notes taken into the bank after February 1, 1930. There was an amount of accommodation paper in the bank in excess of $23,000 which the makers

refused to pay on the ground that there was no consideration for the notes.

Running back through a period of time prior to the date the bank was closed, and prior to February 1, 1930, the cashier and the assistant cashier falsified various records of the bank in an attempt to cover up some of their irregularities and to pad assets. In addition to the amount of accommodation paper held in the bank for the evident purpose of showing by this fiction an apparent enhancement of assets, other assets of the bank such as bonds, real estate, and fixtures were listed among the resources at an amount largely in excess of their real value. Two of the accommodation notes so held in the bank for large amounts were executed by two members of the board of directors other than the president and cashier, and one such note was signed by the assistant cashier. The cashier had diverted large sums of money from the individual accounts of depositors by means of forged checks or otherwise and had used this money in various ways. In two particular instances the money so diverted from individual accounts was loaned to the president of the bank or credited to his account. In one instance the cashier forged a check against the account of a depositor payable to the president of the bank in the sum of $3500. The president admitted that he received the money, but stated he did not know its source. The number and amount of fraudulent diversions so made by connivance of the cashier and assistant cashier do not clearly appear from the evidence in the case, but they were estimated by the deputy commissioner in a claim for indemnity at approximately $50,000.

The capital stock of the bank was $10,000 and on February 1, 1930, it claimed a surplus account of $11,395.45, and undivided profits of $333.05, all of which were listed as liabilities. The remainder of the admitted liabilities on that day was approximately $220,000; the claimed assets were something over $241,000, including bills receivable listed at $166,525.03.

Considering the amount of worthless notes, as demonstrated by the record, it is easily seen that the capital stock and claimed surplus would be expunged and leave the assets so depleted and so far below the amount of actual liabilities as to leave no doubt of insolvency. This condition would appear independent of other liabilities loaded upon the bank through the defalcations of its agents and officers. The most hopeful could not honestly claim that the bank could survive, and this was the opinion of the examiner even from the information afforded him in the preceding October.

In this case the president, cashier, and assistant cashier were all cognizant of the failing condition of the bank and evidently had become aware of its hopeless insolvency. This is particularly true of

the cashiers; and if the president did not know it, it must have been due solely to a lack of capacity for common understanding or the wilful failure to see that which was plainly apparent. The president and the cashier were two of the directors; the other directors were the father, uncle, and brother-in-law of the cashier. In the control of this bank the cashier had been permitted, if he had not been expressly authorized, to exercise plenary power in the management of its affairs and his will was unquestionably the controlling influence in the bank. The records of the bank contained no minutes of any meeting of the board of directors for almost a year. This case presents a striking instance of no management or control on the part of the directors as a board, and of the most absurd mismanagement and glaring dishonesty on the part of the managing officer of the bank. That the president and the cashier transacted the business of the bank according to their own desires and largely for the benefit of their private interests is fully established.

From the statements of the trial court at the time of the rendition of the judgment it appears that a controlling factor in the mind of the judge was his idea that actual knowledge of the insolvency of the bank by the directors must be shown before the knowledge of the cashier of that condition could be imputed to the bank. And the court apparently applied the rule governing the individual liability of a director for the receipt of deposits in a bank when known to be in a failing condition, and that knowledge upon his part at the time must be directly established. Such considerations were not appropriate in this case. The knowledge of the agent of a bank whether he be president, cashier or other person is the knowledge of the bank which he represents in the transaction performed by him within the scope of his authority. The instant case is controlled by the law of agency and not by the statutory liability of a director to respond for the wrongful receipt of deposits by his bank. The plaintiffs in this case deposited their money in good faith with the bank. The person who received that money for the bank was either the cashier or the assistant cashier, and in so receiving said money was performing an act clearly within the scope of his authority as agent for the bank. The knowledge of such agent at said time in reference to the insolvency of the bank was the knowledge of the bank itself, and the act of such agent in receiving the deposit was the act of the bank. The agent of the bank who actually received the money was in possession of the knowledge of insolvency at said time, and knowledge of such fact on the part of all the directors was wholly immaterial.

The language used and the law declared by Chief Justice FULLER in the case of St. Louis, etc. Ry. Co. v. Johnson, 133 U. S. l. c.

576 et seq., is appropriate and applicable here. In that case it was said:

"This bank was hopelessly insolvent when the deposit was made, made so apparently by the operations of a firm of which the president of the bank was a member. The knowledge of the president was the knowledge of the bank. [Martin v. Webb, 110 U. S. 7, 15; Bank v. Walker, 130 U. S. 267; Cragie v. Hadley, 99 N. Y. 131.] In the latter case it was held that the acceptance of a deposit by a bank irretrievably insolvent, constituted such fraud as to entitle the depositor to reclaim his drafts or their proceeds."

And the author adopts and approves the following:

"In the case of bankers, where greater confidence is asked and reposed, and where dishonest dealings may cause widespread disaster, a more rigid responsibility for good faith and honest dealing will be enforced than in the case of merchants and other traders; a banker, who is, to his own knowledge, hopelessly insolvent, can not honestly continue his business and receive the money of his customers; and although having no actual intent to cheat and defraud a particular customer, he will be held to have intended the inevitable consequences of his act, i. e., to cheat and defraud all persons whose money he receives, and whom he fails to pay before he is compelled to stop business."

The law as declared in the foregoing case has been accepted and followed in almost innumerable cases, and it has been consistently held that the knowledge of the particular officer or agent of the bank in charge of a transaction for it was the knowledge of the bank. The applicable rule is again stated by the United States Circuit Court of Appeals, 8th Circuit, in the case of Federal Reserve Bank v. Omaha National Bank, 45 F. (2d) 511, 519, as follows:

"It is a well established principle of law that, when a bank has become hopelessly insolvent, and its president knows that it is so, it is a fraud to receive deposits of checks from an innocent depositor ignorant of its condition, and he can reclaim them or their proceeds."

Many authorities are there cited and we add a few more. [Cunningham v. Bunker (C. C. A. 5), 45 F. (2d) 458, 459; Charleroi Supply Co. v. Kelly, 40 F. (2d) 298; Holloway v. Dykes, 29 F. (2d) 430; First National Bank v. Williams, 15 F. (2d) 586.] Rulings of the Missouri courts are in accord with the foregoing authorities and supply the controlling principle that a bank is bound by the knowledge of its agent and that a preference should be awarded in the case at bar. [Bartlett v. McCallister, 316 Mo. 129, 139 et seq. and cases cited, 289 S. W. 814, 818; Lomax v. Linn County Bank,

1 S. W. (2d) 206, 208; St. Louis-San Francisco Ry. Co. v. Millspaugh, 220 Mo. App. 110, 278 S. W. 786, 788; Stoller v. Coates, 88 Mo. 514; Cottondale Planting Co. v. Diehlstadt Bank, 220 Mo. App. 265, 286 S. W. 425; Citizens Trust Co. v. Coppage, 227 S. W. 1057, 1059; Farmers & Merchants Bank v. Loyd, 89 Mo. App. 262; City Bank of Columbus v. Phillips, 22 Mo. 85, 89.]

The substance of respondent's contention is that there was insufficient proof to show that the bank was hopelessly insolvent at the time the deposit was received; and a failure to show that the fact of insolvency was actually known to the directors; and that the knowledge of the cashier cannot be imputed to the directors and therefore the bank was not bound by the knowledge of the cashier alone. We have seen from the evidence heretofore detailed that it was sufficient to reveal that the condition of the bank was hopeless and that there was actual knowledge of this condition in possession of the president, cashier, and assistant cashier, and that actual knowledge was possessed by the person who received the deposit on behalf of the bank. Upon the second phase of the contention respondent reasons, and apparently assumes, that the only causes of the embarrassed condition of the bank were the forgeries, embezzlements, and other wrongful acts of the cashier which were known to him alone, and that such knowledge is not in law imputed to the bank, and that the bank cannot be held responsible for the acts of a defaulting cashier in the absence of actual knowledge to the directing officers of the bank. Reliance is placed upon the following authorities: Kegan v. Park Bank, 8 S. W. (2d) l. c. 868; State ex rel. Arndt v. Cox, 38 S. W. (2d) 1080; State ex rel. Funk v. Turner, 42 S. W. (2d) 597, 600. The first of the above cases was an action in trover against a bank for the alleged conversion of securities gratuitously kept by the bank and pilfered by an assistant cashier. It was held that when the cashier stole the securities he was not acting in the scope of his authority and that in the absence of knowledge of his dishonesty the bank was not responsible, and that the knowledge of said cashier when acting for himself was not imputed to the corporation. The second case was a suit of depositors against the president of a failed bank to collect from him individually the amount of deposits lost, and the action was based on provisions of the statute, now sections 5381 and 5382, Revised Statutes 1929. In such character of suit there must be proof of actual knowledge of the insolvency of the bank on the part of the individual sought to be held liable. On this point in the case there was a failure of proof. The third case was an action against a bank examiner and his surety to recover a deficiency in the claim of a depositor of a failed bank on account of negligence and breach of duty on the part

of the examiner. The above cases and the case of Perth Amboy Gas Light Co. v. Middlesex County Bank, 45 Atl. 704, are the chief authorities upon which respondent relies. They are pertinent only to the proposition that a bank cannot be held for the defalcation of its cashier in the absence of actual knowledge, and that notice of his defalcations and of the condition of the bank arising therefrom cannot be imputed to the bank. They are not applicable and are not controlling under the facts in the present case, because under the evidence the insolvency of the bank is not attributable alone to the embezzlement and other like wrongs of the cashier, but was due to other causes as well which were sufficient in themselves to create insolvency if there had been no defalcations of the cashier. Independent of the extent to which the financial standing of the bank was affected by the crimes of the cashier, it was so hopelessly crippled on account of the decreased and depleted condition of its assets that there was no reasonable cause to believe that it could ever be retrieved. The bank had no right to remain open and receive deposits. For it to do so was a fraud, and the deposit made by plaintiffs and received under such conditions gave rise to a trust and the bank became a trustee *ex maleficio*.

The knowledge of a cashier of a bank, or that of any other officer, director or agent transacting business for a bank is the knowledge of the bank in reference to that transaction and no actual knowledge on the part of any one else need be shown because it is imputed to the bank. In the present case the evidence shows that at least the president and cashier, both of whom were directors, had been sufficiently warned of the failing condition of the bank prior to the time of the deposit in question, and that they were in possession of facts and of knowledge sufficient to impart to them, or to any man of ordinary prudence, the information that there was no reasonable ground to support a belief that the bank could possibly survive. A bank is insolvent when its liabilities exceed its assets to the extent that it cannot reasonably hope to meet its obligations in the usual course of business; and it is hopelessly insolvent when there is no reason to believe otherwise. Any situation is hopeless in the absence of reasonable cause to hope.

In the case at bar, considering the specific transaction involved, we have an insolvent bank open for business without reasonable hope of life. The agents of that bank were authorized to receive money; they knew the bank's condition, and when money was received by them it was the act of the bank and the knowledge of the agents was the knowledge of the bank. We think the learned trial court was in error in his view of this case and hold that plaintiffs were entitled to recover as upon a priority demand. The judgment

should be reversed, and the case remanded with direction that plaintiffs be awarded judgment in accordance with the views herein expressed. The Commissioner so recommends. *Campbell, C.*, concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded with direction to enter judgment in accordance with the views therein expressed. All concur.