**MID–CONTINENT NATIONAL BANK,**
Plaintiff-Appellant,

v.

**BANK OF INDEPENDENCE,**
Defendant-Respondent.

No. KCD 26779.

Missouri Court of Appeals,
Kansas City District.

May 5, 1975.

Rehearing Denied June 2, 1975.

William F. Mauer, Kansas City, for plaintiff-appellant.

Billy S. Sparks, Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, for defendant-respondent.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

SHANGLER, Judge.

This action is on a cashier's check for $15,370 issued by plaintiff Mid-Continent National Bank to Mildred Ortega [now Bauman] and negotiated to the defendant First National Bank of Independence, which obtained payment upon presentment of the check. The cashier's check had been purchased by Ortega with her personal check knowingly drawn against insufficient funds in the defendant Bank of Independence. The plaintiff bank sought recovery of $12,870, the balance remaining after Ortega reimbursed $2500, on the theory that the defendant Bank of Independence was not a holder in due course of the instrument because it took with notice of the Ortega fraud. Trial to the court resulted in judgment for the defendant Bank of Independence.

The trial was upon deposition testimony and evidence stipulated into the record discursively by counsel. On this appeal, the conclusiveness of the stipulation has come into question, but this much remains undisputed:

The litigation results from the defalcations of Ms. Ortega while employed as a teller by the defendant Bank of Independ-

ence from December of 1965 until June 5, 1969. Among her duties at the collection window was to cash bonds, issue cashier's checks, pay and receive. The duties of this window were shared by Dorothy Walker, Assistant Cashier to whom Ms. Ortega was nominally subordinate. Ms. Walker was under the direction of Don Meyers, the Cashier. Through the use of false entries [which were never fully reconstructed], Ms. Ortega managed to conceal a shortage in her drawer which, by June 3, 1969, amounted to $15,370.00. This shortage was not detected by twelve successive Federal, State and internal audits conducted between January 3, 1967 and August 9, 1968.

While employed by the Bank of Independence, Ms. Ortega became acquainted with Linda McCrary, who subsequently left the defendant bank for employment as a teller with the Mid-Continent Bank. Ms. Ortega testified that June 3, 1969, was the last work day before her vacation. After the close of business, she inquired of Ms. McCrary whether she would issue a cashier's check for her personal check drawn on the Bank of Independence. Ms. McCrary agreed she would. [The parties have stipulated that, if she testified, Ms. McCrary would either deny the conversation altogether or state that she did not remember it.] On the morning of June 4, 1969, the first day of her vacation, Ms. Ortega presented her personal check for $15,370 drawn on the Bank of Independence to Ms. McCrary at the Mid-Continent Bank for a cashier's check in like amount to her order. Ms. McCrary prepared the check, presented it to an officer for signature, and thus validated, delivered the check to Ms. Ortega.

Later that same day, Ms. Ortega delivered the cashier's check, endorsed in blank, to Ms. Walker who returned to her from the drawer the personal check in the same amount drawn by Ms. Ortega on her account in the Bank of Independence. According to the bank records [as stipulated but not displayed at the trial or on this appeal] and the testimony of Ms. Walker, Ms. Ortega placed the cashier's check in the drawer, informed Ms. Walker that an entry on the blotter which showed a transfer of cash to the window of another teller had been made in error and asked that the entry be corrected.

The cashier's check was forwarded through banking channels for presentment and acceptance and was paid by the plaintiff Mid-Continent Bank. The check which Ms. Ortega drew to purchase the cashier's check was dishonored by the Bank of Independence for want of sufficient funds.

Ms. Ortega was charged by the United States with false entries and, on April 10, 1970, was sentenced to probation for a term of five years on her plea of guilty.

The balance of the evidence, the deposition of four witnesses, is discordant.

The plaintiff Mid-Continent Bank [appellant here] contends that the defendant Bank of Independence did not take the cashier's check for value and without notice of defenses against it, and thus was not a holder in due course of the instrument within § 400.3–302, RSMo 1969, V.A.M.S. On these critical issues, the deposition testimony of the parties stands in stark dispute.

The deposition testimony of Ms. Ortega was that for over two and one-half years she had made false entries on the daily blotter which resulted in a growing shortage in her window. In order to balance the blotter, she placed in the drawer and entered on the debit side of the daily transaction sheet checks of her own in the amount of the shortage drawn on insufficient funds in accounts at the Bank of Independence and Mid-Continent.

Ms. Ortega testified that it was the practice of the Bank of Independence not to return checks drawn by its employees on insufficient funds. Each day the Bank of Independence was furnished a computer analysis of all insufficient fund checks

presented there, identified by drawer and account number. Although her name frequently appeared on that list, Ms. Ortega was never called on by the officers of the bank to make explanation or redemption, even though as much as $1,000 in insufficient funds checks might be shown against her account at any given time. Even the computer debit of two dollars against an account for each insufficient item was reversed as to accounts of bank employees by manual entry of recredit of the charge.

All insufficient fund items were routed through the transit department, those written by Ms. Ortega were not charged against her account, but were forwarded to her window, treated as incoming cash, were placed in her drawer and debited on her blotter as a receipt of money. The insufficient funds thus substituted for cash gave the verisimilitude of a balanced blotter. Ms. Ortega testified that only she and Ms. Walker knew the true condition of the drawer.

As to the operation of the window, Ms. Ortega testified that both she and Ms. Walker proved the daily blotter; they took turns counting the drawer, one counted the checks while the other counted the cash. Ms. Walker testified, however, that while she helped to count the checks or the cash in the drawer, Ms. Ortega almost always made the entries on the blotter. She denied that she had ever seen any checks written by Ms. Ortega in the drawer. It was the testimony of Ms. Ortega, on the other hand, that Ms. Walker not only knew of her defalcations [from her knowledge that Ms. Ortega was holding her own insufficient funds checks in their drawer—some for as long as two and one-half years], but that they had discussed the drawer shortages on several occasions. Then, on the evening of June 3, 1969, Ms. Walker told Ms. Ortega that she was going to have to do something about the growing shortage, one way or another. Ms. Ortega replied that she intended to purchase a cashier's check to replace her personal check in the drawer by writing a personal check on the Bank of Independence. Ms. Ortega did not explicitly tell Ms. Walker that she did not have sufficient funds on hand at the Bank of Independence, but that Ms. Walker knew this, since a cashier's check would not have been necessary had the other checks been sufficiently funded.

According to Ms. Ortega, she had placed her personal check for $15,370 in the drawer to cover the accumulated shortage; the check was entered as a debit on the blotter. Then, on June 4, 1969, the first day of her vacation, Ms. Ortega delivered the cashier's check to Ms. Walker who returned the Ortega personal check from the drawer. Ms. Ortega stated that no words were exchanged between them. She insisted, however, that she did not instruct Ms. Walker to change the amount shown as cash on the blotter from the night before, since such an entry would result in a discrepancy between holdover cash figure from the window blotter and the general books of the bank.

Ms. Walker recounted a different narrative of the critical events. She had worked at the Bank of Independence for thirteen years and was then the Assistant Cashier. She and Ms. Ortega shared the collection window and drawer. Ms. Walker never saw any checks in the drawer written by Ms. Ortega and disclaimed any awareness that Ms. Ortega was using her checks to cover shortages. Nor did she remember the conversation of June 3, 1969, when she purportedly importuned Ms. Ortega to correct the drawer. She did remember that on June 4, 1969, Ms. Ortega came to the window and placed the cashier's check in the drawer while Ms. Walker was engaged with customers. As she recalled it, Ms. Ortega told her that the amount of the check had been mistakenly charged to another window, No. 6, and that the entry was to be scratched from the blotter of their window, No. 8. Ms. Walker acknowledged she had seen computer lists of depositors whose

checks had been returned because of insufficient funds on which the name of Ms. Ortega occasionally appeared, but she did not consider it her duty to inquire of her about them.

The cashier of the Bank of Independence, Don Meyers, gave his deposition testimony. The bank investigation disclosed that on June 3, 1969, the day before the cashier's check was placed in the drawer of Window No. 8, Ms. Ortega had transferred $15,370 from her blotter to Window No. 6. Had this transfer of funds not been shown, the shortage in the Ortega window would have appeared. The bank cashier conceded that had Ms. Ortega been covering shortages with her personal checks as she contended, then discovery of these checks in the drawer would give rise to suspicion, for it was not common practice for tellers to write checks in their own windows. Actually, investigation never disclosed the method used by Ms. Ortega to create and conceal the defalcations.

On this evidence, the court found judgment for the Bank of Independence, but entered no findings of fact or conclusions of law. Accordingly, we deem the factual issues to have been found in accordance with the result reached. Rule 73.01(b), V.A.M.R. The respondent suggests that Rule 73.01(3)(b) requires our de novo review to defer to the facts found by the trial court. The matrix of our factual determination, however, is a stipulation and deposition testimony, and because no oral testimony was presented, we enjoy the same coign of vantage to assess credibility as did the trial court, thus the principle of deference does not apply. Meyers v. Smith, 375 S.W.2d 9, 13[1] (Mo.1964).

There is no doubt that when Ms. Ortega negotiated the cashier's check by endorsement, the respondent Bank of Independence became a presumptive holder in due course of the instrument within the meaning of §§ 400.1–201(20) and 400.3–202(1). It is the contention of Mid-Continent, however, that the Bank of Independence, through its agent Ms. Walker, had notice of the fraudulent procurement of the instrument, and thus did not achieve the status of holder.

A holder in due course is defined by § 400.3–202 as one who takes the instrument

(a) for value

(b) in good faith

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

This definition is to be read in pari materia with § 400.3–304

(1) The purchaser has notice of a claim or defense if

(a) the instrument is so incomplete, bears such visible evidence of forgery or alteration, or is otherwise so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay; or

(b) the purchaser has notice that the obligation of any party is voidable in whole or in part, or that all parties have been discharged.

A person has notice of a fact [by the definition of § 400.1–201(25)] when

(a) he has actual knowledge of it; or

(b) he has received a notice or notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

This section is declaratory of established Missouri law that nothing short of actual knowledge or bad faith will defeat the title of a holder in due course, although actual knowledge may be inferred from the facts and circumstances surrounding acquisition of the instrument, but not from cir-

cumstances which would merely put a reasonable prudent person on inquiry. Local Finance Company v. Charlton, 289 S.W.2d 157, 160[1, 2] (Mo.App.1956); McConnico v. Third National Bank in Nashville, 499 S.W.2d 874, 884[8] (Tenn.1973).

■ The cashier's check was regular on its face, thus the question is whether the Bank of Independence had notice that the obligation of Mid-Continent on the instrument was voidable within the meaning of § 400.3–304(1)(b) due to its fraudulent procurement. In the resolution of this issue we take into account that the issuance of the cashier's check was an engagement by Mid-Continent to pay the instrument according to its tenor. § 400.3–413(1). The Bank of Independence urges that this engagement, that funds are on hand to pay the instrument, and that it will be paid, encourages faith in the validity of the instrument and so improves its negotiability. 10 C.J.S. Bills and Notes § 5. This, however, merely begs the question of whether the particular holder, Ms. Walker, took the instrument with notice of its fraudulent procurement. On principles of agency, of course, the knowledge of Ms. Walker while acting within the scope of her authority as Assistant Cashier became the knowledge of the Bank of Independence. Ronchetto v. State Bank of Bevier, 227 Mo.App. 83, 51 S.W.2d 174, 177[1] (1932).

The grant of judgment for the Bank of Independence imports a finding that Ms. Walker received the instrument without knowledge of its fraudulent procurement. We do not accept that presumptive finding of fact. Our review of the record accords credibility on this issue to Ms. Ortega as against the variant testimony of Ms. Walker. The reasons which might induce Ms. Walker to deny knowledge of the Ortega defalcations and of the infirmity in the instrument—the threat of personal and criminal liability—do not bear on the testimony of Ms. Ortega. Her criminal liability has already been adjudicated and her personal liability cannot be affected by which bank may bear the loss. She owes either to Mid-Continent for her fraudulent procurement of the check, or to the Bank of Independence on her endorsement under § 400.-3–414.

The credibility we accord to Ms. Ortega allows these fair inferences from the evidence: Ms. Walker was aware of the shortages in the window shared with Ms. Ortega and acquiesced in the schemes to cover them. She knew that the blotter was being kept in balance by the ruse of the insufficient funds checks. When she became restive about the growing shortages in the drawer, she pressed Ms. Ortega to do something about the matter and, the next day, Ms. Ortega responded by the procurement of the cashier's check. While there was no direct evidence that Ms. Walker knew that the personal check used by Ms. Ortega to purchase the cashier's check was drawn on insufficient funds, the actual knowledge of this fact by Ms. Walker may be inferred: Ms. Walker had seen the name of Ms. Ortega published on several computer lists of checks returned for insufficient funds; she knew that Ms. Ortega intended to purchase the cashier's check with her personal check at the very time the drawer held Ortega checks written against insufficient funds and that the blotter was kept in balance by that subterfuge. Thus, the sheer size of the cashier's check, delivered and displayed to her, taken in conjunction with these other circumstances constitutes actual knowledge of a fraudulent procurement which rendered the obligation on the instrument voidable.

■ At the least, this evidence proves that the instrument was not taken in good faith by the Bank of Independence within the definition of § 400.1–201(19)

"Good faith" means honesty in fact in the conduct or transaction concerned.

This test does not require the holder of an instrument regular on its face to inquire as

to possible defenses unless the facts known to the holder are such that the failure to inquire discloses a desire to evade knowledge for fear it would reveal a defense to the instrument. General Investment Corp. v. Angelini, 58 N.J. 396, 278 A.2d 193, 196[1–6] (1971); Suit & Wells Equip. Co. v. Citizens Nat. Bank of So. Md., 263 Md. 133, 282 A.2d 109, 112 (1971).

If we must assume that the evidence does not prove that Ms. Walker, and hence the Bank of Independence, did not have actual knowledge of the infirmity in the instrument, then it was a willful ignorance prompted by her desire to avoid knowledge of a fact which her previous connivance must have given her cause to suspect. Slaughter v. Jefferson Federal Savings & Loan Association, 361 F.Supp. 590, 598[6] (U.S.D.C. D.C.1973).

We have determined that the Bank of Independence took with notice and in bad faith, thus we need not assess the validity of the contention that the instrument was taken by the Bank of Independence in payment of the debt due from Mrs. Ortega [notwithstanding the defalcations were not then known to the bank] and therefore gave value under § 400.3–303.

Bereft of the status of holder in due course, the Bank of Independence cannot claim the benefit of § 400.3–418 which provides that "payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment". This provision follows the balancing of equities rule of Price v. Neal, 3 Burr. 1354 (1762), whereby the drawee who accepts an instrument bearing the forged signature of the drawer is bound on his acceptance because he is deemed to be in a superior position to detect the forgery. The comments to this section, however, expressly inform that if payment is made to one not a holder in due course because he has either given no value or taken with notice or in bad faith, the payment is not final

because he has no equities as against the drawee. This rule controls here since the Bank of Independence is neither a holder in due course, nor has it changed position in reliance on the check since it had already long before suffered its loss at the hands of Ms. Ortega. For this reason, it is of no avail for the Bank of Independence to complain that it was the negligence of Mid-Continent which made possible the issuance of the cashier's check.

The judgment is reversed and remanded with directions to enter judgment for appellant Mid-Continent National Bank in the sum of $12,870.00.

All concur.