UNITED STATES of America, et al.,

v.

MARK TWAIN BANK—KANSAS CITY, et al. (Two cases)

2001 COMPUTERIZED CONSULTANTS, INC., Appellant,

v.

UNITED STATES of America, TIC Federal Credit Union (TIC) and Bergstrom Federal Credit Union of Austin, Appellees.

Arthur B. SELECTMAN, Jr., d/b/a A & A Replacement Parts; A & A Towing, Perfection Body Shop and Select Industries, Inc., a Kansas corporation, Appellant,

v.

UNITED STATES of America, TIC Federal Credit Union (TIC) and Bergstrom Federal Credit Union of Austin, Appellees.

Nos. 84–2370, 84–2482.

United States Court of Appeals, Eighth Circuit.

Submitted April 8, 1985.

Decided Aug. 21, 1985.

Thomas M. Bradshaw and Arthur H. Staup, Kansas City, Mo., for appellants.

Linda L. Parker, Asst. U.S. Atty., Kansas City, Mo., for appellees.

Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and HARRIS,* Senior District Judge.

LAY, Chief Judge.

The issue on appeal concerns the legal ownership of funds deposited in a bank account held by the Mark Twain Bank under the name of 2001 Computerized Consultants, Inc. (2001). The primary question we confront is whether the trial court, the Honorable D. Brook Bartlett presiding, properly held that Arthur B. Selectman and 2001 were not holders in due course of commercial paper received by them leading to the bank deposit.[1]

In January 1984 Michael Begnaud, a newly elected director of the Oak Park Credit Union, was introduced to a money broker by Phyllis Earleywine. Begnaud indicated he was seeking deposits for the credit union and arrangements were made to obtain funds from trust accounts administered by the Bureau of Indian Affairs (BIA). The funds were placed in various accounts at Mark Twain Bank, Kansas City, personally controlled by Begnaud. Oak Park Credit Union's officers and di-

---

* The HONORABLE OREN HARRIS, Senior United States District Judge for the Eastern and Western Districts of Arkansas, sitting by designation.

1. The present appeal is actually part of a larger case involving other independent parties who received funds Michael Begnaud obtained from the Bureau of Indian Affairs.

rectors apparently had no knowledge of these funds or accounts.

Begnaud then went into the business of commercial lending. Earleywine introduced him to Luther White and, in late January, Begnaud loaned White $1.2 million. Shortly thereafter White and Earleywine offered to arrange a loan with Begnaud for Arthur Selectman.

Selectman, owner of an auto body shop and towing service, was experiencing financial difficulties. The bank with which Selectman had done business for fifteen years, Douglas State Bank, failed in 1983. Selectman's new bank, Indian Springs Bank, failed in January 1984. Selectman was in need of working capital. In addition, Selectman desired a loan because he had the opportunity to acquire an adjacent building and perhaps establish a Goodyear Tire dealership. White, Earleywine, and an attorney, Gregory Coggs—all of whom worked for a newly incorporated entity called 2001 Computerized Consultants—got together with a former vice president of Douglas State Bank to prepare the necessary documents for Selectman's loan. Selectman was not aware of the existence of 2001 and thought White and the others simply offered their help as friends.

In February a summary of Selectman's financial situation was assembled in a "loan package" and presented to Begnaud by White and Coggs. Selectman had sought $900,000 at approximately fourteen percent interest and expected to pay up to four points. Begnaud approved a loan of $850,000 at sixteen percent on the condition that all of Selectman's creditors be paid off so Begnaud would hold the first lien priority on Selectman's assets. Coggs had expressed some concern over Selectman's situation and advised Begnaud to independently examine the loan package.

White met with Selectman in mid-February and informed him he would be charged $100,000 for processing of the loan. Selectman was surprised and upset. He asked for a better deal and approached Earleywine to intercede on his behalf. On March 15, 1984, Coggs and White communicated Begnaud's approval to Selectman and presented him with a "Consulting Agreement" under which 2001 would receive $80,000 and two percent of Selectman's gross profits. This is the first time Selectman heard of 2001. He was told he would not receive the loan unless he signed the agreement. However, after discussion, Coggs and White agreed to drop the two percent of gross profits.

About March 20, Selectman was called to Coggs' office to sign a promissory note and security agreement for Begnaud. Both documents were drafted by Coggs. The next day Coggs obtained a cashier's check for $850,000 from Begnaud. The funds had been drawn from Mark Twain Bank account #780049, known as Oak Park Community Credit Union Funding Account. On the check the remitter was simply noted as "Funding Account." The check designated both 2001 and Selectman as payees.

Coggs and Selectman took the check to Guaranty State Bank to open an account. For some reason the bank declined to open an account, so Coggs took the check to Mark Twain Bank and established account #701114. Cashier's checks in various denominations were issued for a total of $80,000 to payees designated by Coggs, on behalf of 2001. White, Earleywine, and Coggs each received some of that $80,000. The remaining $770,000 was to be held in escrow until Selectman assembled a list of his creditors to be paid and made arrangements with Coggs.

In the meantime, the BIA discovered its funds had gone to Begnaud personally, rather than Oak Park Credit Union. The government sought a temporary restraining order from the district court freezing Begnaud's accounts, the 2001/Selectman account, and enjoining Mark Twain Bank from honoring the cashier's checks issued on behalf of 2001. At the time the order took effect the $770,000 remained in account #701114 and nearly $50,000 of the cashier's checks were still outstanding. Since that time the cashier's checks apparently have been assigned back to 2001 and all parties have consented to the funds

being held by Mark Twain Bank pending the outcome of the case.

This case was tried to the court without a jury. Selectman and 2001 claimed they were entitled to the $850,000 because they were holders in course of the cashier's check from Begnaud. In the alternative they argued they were bona fide purchasers for value. The district court rejected both arguments and directed that the $770,000 and the outstanding cashier's checks, as well as accrued interest, be distributed to the United States. Selectman and 2001 appealed.

The only issue raised by 2001 is whether it was a holder in due course. Selectman raises the same issue in addition to the question of whether the district court acted in excess of its jurisdiction when it entered the temporary restraining order [2] and subsequently entered judgment in favor of the United States.

The government argues that since a bank account is not a negotiable instrument, neither 2001 nor Selectman can claim to be a holder in due course. The question which must be decided is who has superior title or claim to the funds represented by account # 701114 and the outstanding cashier's checks. Title to funds can only be transferred by the delivery of cash or negotiation of an instrument. A negotiable instrument is simply the tangible representation of monies and has no intrinsic value. A holder in due course takes the instrument free from "all claims to it on the part of any person * * *." Mo.Rev.Stat. § 400.-3–305(1). Since the instrument conveys title, a holder in due course may convert the instrument into the cash it represents without becoming subject to the claims of others. To hold otherwise would defeat the purpose of Article Three of the Uniform Commercial Code since no one would accept an instrument that could not be freely

converted to cash without being subject to the claims of unknown parties. Therefore we find the district court properly evaluated Selectman and 2001's title in terms of whether they acquired the funds as holders in due course.

### Claim of 2001

■ Mo.Rev.Stat. § 400.3–302 describes who may be a holder in due course. The district court found no dispute that 2001 and Selectman were holders of a negotiable instrument—the $850,000 cashier's check which was deposited into account # 701114. There was considerable dispute, however, as to whether 2001 and Selectman met the requirements that (1) they gave value, (2) they acted in good faith, and (3) were without notice of any claim on the part of any other person. Section 400.3–302(2) makes it clear a payee can be a holder in due course. The burden is on 2001 and Selectman to establish holder in due course status. Mo.Rev.Stat. § 400.3–307(3). After hearing the evidence the district court found that 2001 failed to prove it had no knowledge of the BIA's claim, nor did 2001 prove value was given for the instrument and that it acted in good faith. These same findings were sufficient to conclude 2001 was not a bona fide purchaser for value.

The district court carefully explained its conclusions regarding notice, value, and good faith. There is ample support in the record for the court's finding that Earleywine was an agent of 2001 and "knew where Begnaud got the funds, knew that he got them ostensibly on behalf of Oak Park Credit Union, and knew that Begnaud was not loaning the money on behalf of Oak Park." The court also found no value was given because the promissory note was not negotiable and 2001 did not make an irrevocable commitment to a third person. Mo.Rev.Stat. § 400.3–303(c). Finally, the court observed that 2001's knowledge of

---

**2.** Under Missouri law, although payment may not be stopped on a check already accepted by the bank, Mo.Rev.Stat. § 400.4–303(1)(a), no statute forbids the court from freezing a bank account. Only 2001 raised the issue below; the outstanding checks have been assigned to 2001, which has consented to the continued freeze of

the funds pending the outcome of this case. Because of our ruling on the merits no further discussion concerning this issue is required. Selectman's argument that the United States lacks standing to maintain an equitable action against him is without merit because Selectman voluntarily intervened under Fed.R.Civ.P. 24.

Begnaud's fraudulent activities prevented it from establishing good faith. Upon review, we believe these factual findings are not clearly erroneous; thus we affirm the judgment against 2001.

**Claim of Selectman**

The district court similarly found Selectman was not a holder in due course and was thus unable to overcome the claim of the United States to the funds. However, the basis of the district court's finding that Selectman was not a holder in due course is unclear. After noting (1) Selectman hired 2001 to obtain the loan, and (2) Selectman and 2001 were co-payees on the instrument, the court held "2001's failure to satisfy the lack of notice requirement must infect the status of [Selectman] as a holder in due course." It is not clear whether the court based its judgment on a finding that 2001 was Selectman's agent or that the knowledge of one payee infects the other. Notice cannot be imputed simply as a result of a co-payee relationship. When one payee has knowledge of a claim against the instrument and the co-payee is without actual knowledge, the co-payee can be a holder in due course. *See General Motors Acceptance Corp. v. General Accident Fire & Life Assurance Corp.*, 67 A.D.2d 316, 415 N.Y.S.2d 536, 538 (1979); *National Security Fire & Casualty Co. v. Mazzara,* 289 Ala. 542, 268 So.2d-814, 816–17 (1972). On the other hand, an agent's knowledge of claims against a negotiable instrument, or the fund it represents, can be imputed to the principal. *See Warren v. Lopatin,* 475 F.2d 1329 (D.C.Cir.1973); *Waterbury Savings Bank v. Jaroszewski,* 4 Conn.Cir. 620, 238 A.2d 446 (1967). The knowledge must arise within the scope of the agent's authority. *Mid-Continent National Bank v. Bank of Independence,* 523 S.W.2d 569 (Mo.App.1975). *See also Millman v. State National Bank of Maryland,* 323 A.2d 723 (D.C.1974); *American Underwriting Corp. v. Rhode Island Hospital Trust Co.,* 111 R.I. 415, 303 A.2d 121 (1973). The district court did not make a factual finding that 2001 was Selectman's agent. Since no such finding was made explicitly and the court erroneously may have based its judgment on the co-payee

relationship, we must remand. In addition, the court might have concluded that Selectman personally had notice of the BIA's claim. There is little evidence in the record to support such a conclusion; in any event the record is silent as to the district court's finding in that regard. We ask that the district court be specific in its finding concerning Selectman's alleged notice of the BIA claim.

The district court also found Selectman failed to prove good faith and that value was given for the cashier's check. If affirmed, either finding would be sufficient to uphold the court's judgment against Selectman. The court found "[t]he same facts which prevent 2001 and [Selectman] from satisfying the lack of notice requirement also prevents 2001 from establishing that it took the $850,000 cashier's check in good faith." Once again, we are not clear what facts or finding this statement is based upon. The court's finding that "Selectman did not want to rock the boat by asking questions for fear some problem would develop" does not support a finding that he lacked good faith. It is well established that suspicious circumstances surrounding a transaction are not sufficient to defeat good faith. *Central Bank & Trust Co. v. First Northwest Bank,* 332 F.Supp. 1166, 1169 (E.D.Mo.1971), *aff'd,* 458 F.2d 511 (8th Cir.1972); *Mid-Continent National Bank,* 523 S.W.2d at 574–75; *O.P. Ganjo, Inc. v. Tri-Urban Realty Co.,* 108 N.J. Super. 517, 261 A.2d 722 (1969). The district court faults Selectman for not inquiring into Begnaud's background. But the usual concern is the borrower's ability to pay, not the lender's ability to lend. The record in this case does not reflect that Selectman was guilty of a reckless or intentional avoidance of knowledge. We therefore request the district court to make specific factual findings supporting its conclusion regarding Selectman's good faith.

The district court correctly concluded that the promissory note given to Begnaud by Selectman was not a negotiable instrument and did not constitute value under section 400.3–303(c). The court, however, failed to analyze whether the consulting contract between 2001 and Selectman con-

stituted "an irrevocable commitment to a third person." § 400.3-303(c). On its face, the contract obligation of $80,000 for "consulting services" is not contingent on Selectman receiving the Begnaud loan, although the contract was not signed until Selectman was assured the loan was approved. Resolution of whether this contract constitutes an irrevocable commitment will require application of Missouri's parole evidence rule.[3] On remand, we ask the district court to consider this issue. If the court finds, as it did before, that Selectman had notice of the BIA's claim—either on the basis of actual knowledge or on the finding of agency—or did not act in good faith, or did not give value, then Selectman can be neither a holder in due course nor a bona fide purchaser for value. Our concern is to examine the factual foundation upon which the court based its legal conclusions.

For the reasons set forth, we affirm the judgment against 2001 and order a remand to the district court to make factual findings as set forth in our discussion. The findings of the district court should be certified back to this court within sixty days.

Affirmed in part and remanded in part.

**3.** For purpose of § 400.3–303(c), 2001 is a "third person." The language is clearly intended to refer to anyone other than the transferor of the instrument (in this case Begnaud).